STATE of Iowa, Appellee,

v.

Sandra Kay FRANK, Appellant.

No. 63321.

Supreme Court of Iowa.

Nov. 12, 1980.

William Pappas, Mason City, for appellant.

Thomas J. Miller, Atty. Gen., and John P. Messina, Asst. Atty. Gen., for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, HARRIS, LARSON and SCHULTZ, JJ.

SCHULTZ, Justice.

This is an appeal from a conviction of first–degree murder in violation of section 707.2, The Code 1977. Defendant contends that (1) media publicity during the course of the trial denied her a fair trial, and (2) the trial court committed prejudicial error by allowing the jury to consider incriminating testimony by a state's witness which was subsequently recanted during the trial. We affirm the trial court.

On August 30, 1978, eighty–eight year old George E. O'Harrow was beaten to death at his residence in Mason City, where he lived alone. On November 1 defendant, Sandra Kay Frank, was charged by information with committing the murder. Defendant entered a plea of not guilty, and trial commenced on February 5, 1979, in Cerro Gordo District Court. The trial was adjourned and continued on February 7 because two of the state's witnesses–Penny Frank, the defendant's sister and the state's principal witness, and Andrew Rupar–failed to respond to subpoenas. The witnesses were arrested in Tempe, Arizona, brought back to Cerro Gordo County to testify, and held in custody as material witnesses during the remainder of the trial.

During the continuance, the local news media reported stories on the missing witnesses. When the trial resumed on February 27, defendant, citing this publicity, unsuccessfully moved for a continuance of two weeks or in the alternative for a mistrial. Defendant contends the mistrial should have been granted because there is a substantial likelihood that the jury's verdict was influenced by exposure to the news reports.

On February 27 Penny Frank testified that the defendant had admitted committing the murder. The following day she recanted her entire testimony, stating that she had lied. The jury, which was allowed to consider her testimony, returned a guilty verdict. Defendant alleges that due to the recantation Penny Frank's testimony had no probative value and thus should not have been considered by the jury.

I. *Prejudicial trial publicity.*

During the continuance, the news media gave the absent witnesses what defendant refers to as "widespread" publicity. These news accounts contained various statements referring to Penny Frank as a "key witness" having "key testimony" that would be essential in implicating her sister. Stories reported that bench warrants had been issued, and that a nationwide search for the missing witnesses was under way. One news item quoted the prosecutor as stating that the state had sworn statements from the witnesses but that they "are not admissible as evidence in the trial . . . unfortunately." Another story reported the sheriff as stating that the witnesses were in contempt of court and would be jailed if apprehended. After the witnesses had been returned, another news account reported the sheriff as stating that the witnesses were being held and that contempt citations had been issued.

Defendant contends that there is a substantial likelihood that the jury's verdict was influenced by exposure to this publicity, and that a new trial must be granted. Unquestionably, a person accused of committing a crime has a fundamental right to a fair trial by an impartial jury whose determination of guilt or innocence is based exclusively on evidence admitted at trial. The media, however, have a competing right to report factually accurate information. These rights must be accommodated in the best manner possible. *State v. Sefcheck*, 261 Iowa 1159, 1173, 157 N.W.2d 128, 136 (1968).

In *State v. Bigley*, 202 N.W.2d 56, 58 (Iowa 1972), we adopted standard 3.5(f), A.B.A. Standards Relating to Fair Trial and Free Press, as the procedure to be applied when the issue of possible jury exposure to potentially prejudicial material is raised at trial. That standard provides:

> If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court *may* on its own motion or *shall* on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4(b), above, except that a juror who has seen or heard reports of potentially prejudicial material shall be excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

(emphasis added).[1] Standard 3.5(f) therefore imposes a mandatory duty on the trial court to question jurors when a proper request has been made. Unless a specific request is made, however, the matter rests in the sound discretion of the trial court.

Defendant did bring the matter of the publicity concerning the missing witnesses to the attention of the trial court by moving for a mistrial. Defendant did not move to have the jurors questioned regarding their exposure to the publicity, however. Thus, under standard 3.5(f), there was no mandatory duty for the trial court to examine the jurors. Defendant nevertheless maintains that the issue was adequately raised and that the trial court chose to ignore it.

■ Matters committed to the discretion of a lower court are not reviewable upon appeal; only the alleged abuse of that power is reviewable. *Rath v. Sholty*, 199 N.W.2d 333, 336 (Iowa 1972). We must, therefore, determine whether the trial court abused its discretion in not examining the jury. Generally, abuse of discretion will be found only when there is no support in the record for the trial court's action. *Id.*

■ Defendant argues that the number and contents of the news accounts surrounding the missing witnesses are of sufficient magnitude to establish a substantial likelihood of probable jury prejudice. We find no merit in this contention. We will not presume prejudice from the mere publication or broadcast of news stories. *State v. Sefcheck*, 261 Iowa at 1173, 157 N.W.2d at 136. The trial court need not act on mere speculation.

■ When a jury has been clearly admonished not to expose themselves to media publicity of the trial in which they are serving as jurors, a presumption arises that they will not violate that admonition. *State v. Sallis*, 262 N.W.2d 240, 246 (Iowa 1978) (quoting *Rizzo v. United States*, 304 F.2d 810, 815 (8th Cir.), *cert. denied*, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962)). Not only is the burden on the defendant to demonstrate jury exposure to trial publicity, but unless specific examples are presented of jurors being affected by such publicity, it weighs heavily against the defendant's position. *Id.* at 247. Throughout the trial, the court was careful to admonish the jury not to expose themselves to publicity concerning the case. We have thoroughly examined the record and cannot find anything which would overcome the presumption of nonviolation of these admonitions.

■ In asserting that the trial court had an affirmative duty to examine the jury in this case, defendant relies on *United States*

---

1. Section 3.4(b), which is incorporated in standard 3.5(f) by reference, establishes criteria for determining when a juror who has been exposed to publicity should be dismissed. Among the factors to be considered are: the degree of exposure to the publicity, the juror's testimony regarding his or her state of mind, whether or not an opinion has been formed, the significance of information which is inadmissible as evidence, and whether the material is inflammatory.

*v. Titsworth*, 422 F.Supp. 587 (D.Neb.1976), and *State v. Williams*, W.Va., 230 S.E.2d 742 (1976). In both of these cases, however, there was evidence of jury exposure to trial publicity. These cases are, therefore, inapposite. Defendant also cites *United States v. Hall*, 536 F.2d 313 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976). *Hall* dealt with the examination of prospective jurors when there is a possibility of exposure to prejudicial pretrial publicity and is therefore also distinguishable. In the case before us, the jury had been impaneled and admonished not to expose themselves to media publicity about the case when the witnesses failed to respond to subpoenas.

We find no abuse of discretion on the part of the trial court in failing to examine the jurors *sua sponte.*

## II. *Recanted testimony.*

On February 27, 1979, defendant's sister, Penny Frank, was called as a witness on behalf of the state. She testified that approximately one month before the murder she and the defendant went to the victim's home because the defendant "wanted to see what he had in the house." They gained entrance under the pretense of having car trouble, by asking if they could use the victim's telephone. The witness testified in detail about a conversation she had with the victim. She recalled that the victim had stated that the next–door neighbor, who leased a house owned by the victim, was a year behind in her rent and that the victim was having an airconditioner in the living room repaired. She outlined in specific terms the physical layout of the house, its condition, and the location of physical objects such as a chair, refrigerator, telephone, and garbage sacks. She also recalled seeing a picture of the victim's son. While there, according to her testimony, the defendant stole a watch. The witness also stated that the defendant subsequently talked about going back to the victim's house.

Penny Frank further testified that on the night of August 30, 1978, the date of the murder, defendant told her that she thought she had killed the victim. She also recalled a later conversation in which defendant described events preceding the murder. The defendant stated that she had sneaked into the house, and when the victim spotted her he attempted to make a telephone call. The defendant then pulled the telephone cord from the wall. A struggle ensued, the defendant struck the victim with a wrench, and when the defendant left the premises the victim was lying on the kitchen floor. Later, the defendant reportedly said to the witness, "[H]ow do you like that, Penny. You can get away with murder and the cops won't find out."

The following day Penny Frank was called as a defense witness. She recanted her testimony and prior statements, saying that she had lied: "I did it because I was awful mad at Sandy since I figured she had made a phone call to the social worker and that's why my daughter was taken away from me for a week." After the close of testimony, defendant moved for a directed verdict of not guilty, contending that the recanted testimony should not be considered and that without it there was not sufficient evidence to submit the case to the jury. The motion was overruled, and the jury considered all of Penny Frank's testimony. Defendant alleges that the trial court erred in so ruling because the recanted testimony had no probative value.

The issue of recanted testimony usually arises when the recantation occurs after a verdict has been rendered. In such cases the recantation of testimony by a witness for the prosecution does not necessarily entitle the defendant to a new trial. The determination as to whether a new trial should be granted is within the discretion of the trial court. *State v. Thompson*, 241 Iowa 16, 29, 39 N.W.2d 637, 645 (1949). That determination will not be disturbed upon appeal unless it is reasonably clear that such discretion was abused. *State v. Taylor*, 287 N.W.2d 576, 578 (Iowa 1980). Each case must be judged on its own peculiar facts. *State v. Thompson*, 241 Iowa at 29, 39 N.W.2d at 645.

In determining whether a new trial should be granted, the trial court is not required to believe the recantation. The court must make its decision on the basis of the whole trial and matters presented in conjunction with the motion. *State v. Compiano*, 261 Iowa 509, 517, 154 N.W.2d 845, 849 (1967). In *Compiano* we said that a person

> convicted of a crime should not be granted a new trial unless the trial court is satisfied that the testimony of a material witness was false or mistaken, and unless a jury might reach a different conclusion without such testimony.

A witness' recantation of his testimony is looked upon with utmost suspicion. *Id.* at 516, 154 N.W.2d 849. Thus, a witness' recantation of testimony subsequent to trial does not give a litigant an automatic objection that the recanted testimony has no probative value and therefore could not be used to support a judgment.

This is a case in which the witness' recantation occurred during trial. Either Penny Frank's testimony as a state's witness or her recanting testimony as a defense witness was perjured. The question that is raised by this witness' recantation goes to her credibility, which is ordinarily a question for the jury.

Generally, there are no limitations on the rule that the credibility of a witness is to be determined by the jury. Defendant, however, contends that the exception established in *Graham v. Chicago & Northwestern Ry. Co.*, 143 Iowa 604, 119 N.W. 708 (1909), is applicable in this case. In *Graham* this court stated:

> This court has gone its full length to protect the right of jury trial against encroachment by the courts under any guise, and one of the rights of jury trial is the right to have the credibility of the witness determined by the jury. Generally speaking there are no limitations upon this rule, but there are limitations upon the application of it. The testimony of a witness may be so impossible and absurd and self–contradictory that it should be deemed a nullity by the court.

*Id.* at 615, 119 N.W. at 711. *Graham* involved a witness' testimony concerning events surrounding an accidental death. Although the witness had been fully interrogated about the details of the accident in the first trial, he gave a different and self–contradictory account of certain facts during a second trial. The only explanation given for the change of testimony was that the witness had not been asked at the first trial, which was untrue. This court found that absent explanation the witness' testimony was "so manifestly insincere and absurd that no person could candidly believe it." *Id.* at 614, 119 N.W. at 711.

The *Graham* limitation was also addressed in *State ex rel. Mochnick v. Andrioli*, 216 Iowa 451, 249 N.W. 379 (1933):

> The rule that it is for the jury to reconcile the conflicting testimony of a witness does not apply where the only evidence in support of a controlling fact is that of a witness who so contradicts himself as to render finding of facts thereon a mere guess. We may concede that, ordinarily, contradictory statements of a witness do not make an issue of fact; and that such situation may deprive the testimony of all probative force.

*Id.* at 453, 249 N.W. at 380. The *Andrioli* court went on to find the limitation inapplicable, however, because other competent testimony existed which corroborated the witness' changed testimony. *Id.* at 453, 249 N.W. at 380.

We need not determine whether the *Graham* limitation applies to recanted, as opposed to merely self–contradictory, testimony in this case because, even if applicable, the recantation here does not fall within that limitation. First, the alleged reason for Penny Frank's recantation was explained to the jury, thus giving the jury full opportunity to judge the credibility of the witness and ascertain the veracity or falsity of her testimony or any part thereof. Second, the recanted testimony was not the *only* evidence supporting defendant's conviction. There was circumstantial evidence linking the defendant to the scene of the crime. Defendant was in the vicinity of the

victim's home on the date of the murder. In addition, a palm print, which was identified by an expert witness as being the defendant's, was found on the side of a refrigerator in the victim's home near the area where the body was discovered. There was also evidence that defendant sold a clock that, in the opinion of an expert witness, once hung on a wall at the victim's residence.

Third, there is evidence which corroborates the recanted testimony. In her written recantation statement, which was prepared in the office of defendant's attorney and introduced in evidence by defendant, Penny Frank said that she had revealed to law enforcement officials prior to the defendant's arrest that defendant stated that she had pulled the victim's telephone cord from the wall and struck the victim with a wrench. According to the trial testimony of one of these officials, information regarding the identity of the murder weapon was not released to the public until October 27, 1978, seven days after defendant's arrest, and information concerning the telephone cord was not released prior to the commencement of the trial. Furthermore, Penny Frank's alleged reason for giving testimony which incriminated the defendant—because she thought defendant was responsible for her daughter being taken away—was discredited by a social worker.

In light of the independent evidence corroborating the recanted testimony of Penny Frank, we conclude that her recantation did not deprive her former testimony of all probative force. The jury was not placed in a position of having to speculate or make a "mere guess" on the fact of defendant's guilt. Both Penny Frank's recantation and the independent corroborating evidence went to the credibility of her former testimony. The reconciliation of the recantation with the evidence corroborating the witness' prior testimony was properly a matter for the jury. The trial court, therefore, did not err in allowing the jury to consider the recanted testimony of Penny Frank.

We find no merit in defendant's assignments of error. The judgment of the trial court is

AFFIRMED.