# IN THE COURT OF APPEALS OF IOWA

No. 14-0816
Filed September 10, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**THEODORE RAY GATHERCOLE II,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Stephen B. Jackson Jr., Judge.


        Defendant appeals his convictions for attempted murder and robbery in the first degree.  **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Kevin Cmelik and Mary A. Triick, Assistant Attorneys General, Jerry Vander Sanden, County Attorney, and Nicholas Maybanks, Assistant County Attorney, for appellee.


        Heard by Tabor, P.J., and Bower and McDonald, JJ.

**MCDONALD, J.**

Theodore Gathercole appeals his convictions for attempted murder, in violation of Iowa Code section 707.11 (2011), and robbery in the first degree, in violation of sections 711.1 and 711.2. On appeal, he argues there was insufficient evidence to establish he had the specific intent to cause death, an element of attempted murder, and there was insufficient evidence he had the specific intent to commit a theft, an element of robbery. The defendant also contends his right to a fair trial was violated when the district court refused to interrupt the jury's deliberations and poll the jury after the defendant's counsel discovered a news item published on a website containing information not in the record.

I.

On June 16, 2013, Gathercole was at his ex-wife's apartment in Cedar Rapids. Frederick Rottmiller, a maintenance worker for the apartment complex, came to look at a water leak in the ex-wife's apartment. Rottmiller and Gathercole were familiar with each other because Gathercole resided on and off at his ex-wife's apartment. Gathercole asked Rottmiller to lend him money, and Rottmiller gave Gathercole twenty dollars. They then parted ways.

Later that evening, Gathercole went to Rottmiller's apartment and asked to borrow more money. Gathercole explained he needed transportation to visit someone in the hospital. Rottmiller declined to loan him the money, but Rottmiller did offer Gathercole a ride to the hospital. Rottmiller asked Gathercole to meet him outside by his truck, and Gathercole agreed.

A few minutes later, Rottmiller left his apartment and proceeded outside to meet Gathercole.  Rottmiller owned two pickup trucks, which were parked next to each other in the parking lot.  As Rottmiller approached the trucks, he saw someone he believed to be Gathercole standing between the passenger-side door of one truck and the driver-side door of the other truck.  Rottmiller went between the two trucks to unlock the passenger-side door.  As Rottmiller was getting out the key to unlock the door, he was stabbed in the belly.  A struggle ensued, during which the assailant said, "I know I'm going to prison for this."  Rottmiller sustained further injuries during the struggle.  The assailant fled the scene and left Rottmiller on the ground bleeding underneath the truck.  At trial, Rottmiller recalled the assailant making a statement that he was going to call 911.  The assailant never called 911.  Later, a passerby observed Rottmiller's legs protruding from under the pickup truck.  The passerby attempted to assist Rottmiller, but Rottmiller was unable to move.  The passerby flagged down a taxi driver, who called 911.  While they waited for emergency assistance, the taxi driver asked Rottmiller what happened.  Rottmiler said he was attacked and it was the "guy over there . . . in that apartment, that building."

Paramedics arrived at the scene and transported Rottmiller to the hospital. The doctors found Rottmiller had suffered serious injuries, including multiple stab wounds: one to the left eye, one to the neck, and one to the abdomen near the "belly button."  His condition was listed as severe to critical, and his injuries were considered to present a substantial risk of death.

Based on Rottmiller's identification, the police arrested Gathercole.  The State charged him with attempted murder, robbery in the first degree, and willful injury.  Trial commenced on February 3, 2014, and Gathercole's defense was twofold.  First, he attacked the evidence of identity, arguing to the jury that it was dark outside and no physical evidence connected him to the crime.  Second, he attacked the evidence of intent, arguing there was insufficient evidence to establish the assailant had the intent to kill or commit a theft.

The case was submitted to the jury on February 6, 2014.  While the jury was deliberating, defense counsel brought to the attention of the district court a news item published or last updated on February 5 on the Cedar Rapids Gazette's website.  The news item stated the police had found a palm print matching Gathercole's palm print at the crime scene.  The statement was incorrect.  A palm print was found on the side of one of the trucks, but the palm print matched Rottmiller.  Defense counsel moved for a mistrial or, in the alternative, requested the district court poll the jury to determine if any of the jurors were aware of the news item.  The district court denied the motion for mistrial and denied the request to interrupt deliberations in the absence of counsel finding authority in support of the request.  Defense counsel never presented authority in support of the request to poll the jury and never raised the issue again.

The jury found Gathercole guilty on all three counts.  The district court concluded count three, willful injury, merged into count two, robbery in the first degree, and did not convict or sentence Gathercole on count three.  The district

court sentenced Gathercole to a term of incarceration not to exceed twenty-five years. Gathercole timely filed this appeal.

## II.

We review a challenge to the sufficiency of evidence for correction of errors at law. *See State v. Showens*, 845 N.W.2d 436, 439 (Iowa 2014). We "consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it." *Id.* at 439-40 (citation omitted) (internal quotation marks omitted). "If a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt, the evidence is substantial." *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997). But "[e]vidence that raises only 'suspicion, speculation, or conjecture' is *not* substantial evidence." *Id.* (quoting *State v. Barnes*, 204 N.W.2d 827, 829 (Iowa 1972)).

## A.

Gathercole contends there was insufficient evidence to establish he had the specific intent to cause Rottmiller's death, an element of attempt to commit murder. *See* Iowa Code § 707.11(1) (defining attempt to commit murder).[1]

---

[1] He also argues there was insufficient evidence to establish he had the specific intent to cause serious injury, an element of willful injury. *See* Iowa Code § 708.4 (defining willful injury). Serious injury means "a bodily injury which creates a substantial risk of death which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ." *Id.* § 702.18. Because the district court merged the conviction and sentence for willful injury into the robbery conviction, and because we conclude there is sufficient evidence to support the robbery conviction, we need not address the challenge to serious injury separately. That being said, we conclude the

Generally, the defendant's specific intent is incapable of direct proof. *See State v. Clarke*, 475 N.W.2d 193, 197 (Iowa 1991). Instead, intent must be inferred from the surrounding facts. *Id.* When viewed in the light most favorable to the State, we conclude there is sufficient evidence establishing the intent to cause death.

Use of a deadly weapon supports an inference the assailant acted with the intent to commit murder. *See State v. Smith*, 242 N.W.2d 320, 326 (Iowa 1976) (concluding "malice aforethought may be inferred from defendant's use of . . . a deadly weapon" in a second-degree-murder prosecution); *State v. Hepner*, 161 N.W.2d 714, 720 (Iowa 1968) (stating that use of a deadly weapon supports inference of intent to commit murder necessary for a conviction of assault with intent to commit murder). Here, the evidence showed the defendant stabbed Rottmiller with a blade six to eight inches in length. The length of the blade and its use supports an inference the defendant intended to cause Rottmiller's death.

Gathercole's intent to kill may also be inferred from the nature and severity of the injuries sustained. *See State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981) (stating that multiple stab wounds supply strong evidence of malice and intent to kill); *State v. Bell*, 223 N.W.2d 181, 184 (Iowa 1974) ("[T]he extent of injury may be taken into consideration in determining defendants' intent."). Gathercole stabbed the victim several times. Each injury was severe and potentially capable of causing death. Gathercole stabbed Rottmiller in the abdomen. The wound was deep enough that it perforated Rottmiller's intestines. He had six to eight

---

same evidence establishing the intent to cause death is sufficient to establish the intent to cause serious injury.

inches of his intestines removed. Gathercole stabbed Rottmiller in the neck. The wound was deep enough that it chipped Rottmiller's vertebra and partially separated his spinal cord. He has lost the ability to walk, and certain life functions have been permanently altered. Gathercole stabbed Rottmiller in his left eye. The wound was deep enough that it resulted in several surgeries. Rottmiller is now legally blind in that eye. A jury could reasonably infer Gathercole intended to kill Rottmiller based on the nature and severity of these injuries. *See State v. Hunt*, 801 N.W.2d 366, 377 (Iowa Ct. App. 2011) (affirming conviction for attempt to commit murder where severe nature of the injuries supported inference the defendant intended to cause death of another).

We find unpersuasive Gathercole's argument that he lacked the intent to kill because Rottmiller testified the assailant stated he was going to call 911. First, while the assailant stated he was going to call 911, there is no evidence of an actual attempt to call for help. Instead, the evidence showed the assailant left Rottmiller on the ground to bleed out and die without calling for assistance. Further, even if the assailant had called 911 for help after the fact, it would not necessarily establish he lacked the requisite intent at the time of the attack. It is equally likely he had remorse. The resolution of the evidence was for the jury, and we decline to disturb their verdict. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993).

B.

Gathercole also challenges the sufficiency of the evidence establishing he had the specific intent to commit a theft, an element of robbery. *See* Iowa Code

§ 711.1(1). Gathercole argues there is little evidence of intent to commit theft. For example, the assailant did not demand money during the attack. In addition, many of Rottmiller's personal items of value were lying on the ground around him, in his pockets, and in the bed of his truck, which would be inconsistent with intent to commit theft. Gathercole notes that none of Rottmiller's belongings were ever found in Gathercole's possession. Finally, Gathercole argues that the State's contention that some money could have been taken is pure speculation and thus insufficient to support guilt. *See State v. Truesdell*, 679 N.W.2d 611, 618-19 (Iowa 2004).

We conclude, when the evidence is viewed in the light most favorable to the verdict, there is substantial evidence establishing the specific intent to commit theft. *See State v. Keeton*, 710 N.W.2d 531, 535 (Iowa 2006). There is substantial evidence Gathercole was experiencing severe financial difficulties. *See State v. Boley*, 456 N.W.2d 674, 679 (Iowa 1990) (affirming conviction where the evidence showed the defendant lacked and needed funds). He did not have a significant income. He owed back child support. He had no residence of his own but split time between his ex-wife's and his girlfriend's residences. He often relied on borrowing money from other people. Earlier in the day, prior to the attack, Gathercole asked Rottmiller for money. Immediately prior to the attack, Gathercole knocked on Rottmiller's door and asked for money. Rottmiller refused but agreed to meet Gathercole outside and give him a ride. A reasonable jury could infer that Gathercole used this opportunity to lie in wait and take the money Rottmiller refused to give him. Finally, we note there is evidence

that some of Rottmiller's money was missing. That fact, however, is nonmaterial. "A conviction of robbery requires proof of the intent to commit a theft and not proof of the actual theft." *Boley*, 456 N.W.2d at 679 (citing *State v. Rich*, 305 N.W.2d 739, 746 (Iowa 1981)). Gathercole may have simply lost his nerve and fled the scene after realizing what he had done.

## C.

For the foregoing reasons, we conclude there was sufficient evidence to support the jury's verdicts for attempted murder and robbery.

## III.

Gathercole argues the trial court's refusal to poll the jury after counsel brought the news item to the court's attention violated his right to fair trial. *See Shepperd v. Maxwell*, 384 U.S. 333, 363 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences."). The leading case addressing this issue in Iowa is *State v. Bigley*, 202 N.W.2d 56, 57-58 (Iowa 1972). In that case, the supreme court adopted American Bar Association Criminal Justice Standard 3.5(f) from the ABA Standards Relating to Fair Trial and Free Press. *See Bigley*, 202 N.W.2d at 58. The standard reads:

> If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4(b), above, except that a juror who has seen or heard reports of potentially prejudicial material shall be

> excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

*Id.* The standard creates a mandatory duty for the district court to poll the jurors if either counsel requests a poll of the jury and the "material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice." *Id.*; *see also State v. Frank*, 298 N.W.2d 324, 327 (Iowa 1980) (concluding the standard "imposes a mandatory duty on the trial court to question jurors when a proper request has been made"). If neither party raises the issue or requests a poll of the jury, the district court may make further inquiry on its own motion at its discretion. *Bigley*, 202 N.W.2d at 58.[2] Of course, the initial determination of whether there is a serious question of possible prejudice is for the district court. *See Mu'Min v. Virginia*, 500 U.S. 415, 430 (1991) (interpreting and applying ABA Standards for Criminal Justice 8-3.5 (2d ed. 1980) regarding voir dire and pretrial publicity); *United States v. Hood*, 593 F.2d 293, 296 (8th Cir. 1979) (stating "the trial judge must make an initial determination as to whether the publicity creates a danger of substantial prejudice to the accused").

Subsequent decisions have addressed to some extent the meaning of "serious questions of possible prejudice." In *State v. Burt*, 249 N.W.2d 651, 653

---

[2] Since *Bigley*, the standard has been revised to provide the district court with discretion to poll the jury in all instances. *See* ABA Criminal Justice Standards on Fair Trial and Pub. Discourse 8-5.5(d) (Aug. 2013), *available at* http://www.americanbar.org/groups/criminal_justice/standards/crimjust_standards_fairtrial_blk.html ("If, during the trial, the court determines that information has been disseminated or otherwise made publicly available that goes beyond the record on which the case is to be submitted to the jury and raises serious questions of prejudice, the court may on its own motion or on the motion of either party question each juror, out of the presence of the others, about exposure to that information.").

(Iowa 1977), a shoplifting case, the defendant contended a news article published during trial could be interpreted to connect him with another theft. The defendant requested the district court poll the jury, which the district court declined to do. *See Burt*, 249 N.W.2d at 654. The supreme court stated the district court did not have a mandatory duty to poll the jury unless "the material per se raises serious questions of possible prejudice." *Id.* The court concluded the material in that case did not rise to that threshold. *See id.* "Thus it devolved on defendant to demonstrate evidence of jury prejudice." *Id.* The court concluded the defendant failed to establish prejudice, noting "no reason was advanced to believe jurors had violated trial admonition." *Id.* In *State v. Frank*, 298 N.W.2d 324, 327 (Iowa 1980), the defendant argued that the number and content "of the news accounts surrounding . . . missing witnesses [were] of sufficient magnitude to establish a substantial likelihood of probable jury prejudice." The supreme court concluded there was "no merit in this contention. We will not presume prejudice from the mere publication or broadcast of news stories. The trial court need not act on mere speculation." *Frank*, 298 N.W.2d at 327. Two considerations were of significance in reaching that conclusion. First, "[w]hen a jury has been clearly admonished not to expose themselves to media publicity of the trial in which they are serving as jurors, a presumption arises that they will not violate that admonition." *Id.* Second, the supreme court was reviewing the district court's failure to raise the issue sua sponte for an abuse of discretion only because the issue was not raised before the trial court. *Id.* at 328. In *State v. Jones*, 511 N.W.2d 400, 408 (Iowa Ct. App. 1993), the defendant

requested the district court poll the jury where members of the defendant's family stated they saw a local television news program they interpreted to mean the defendant carried the burden of disproving certain allegations. The district court denied the request, which our court affirmed, concluding the defendant failed to establish prejudice where no copy of the news items was provided to the court and there was no evidence the jury violated the admonition. *Jones*, 511 N.W.2d at 408.

In light of the foregoing authority, we conclude the phrase "serious questions of possible prejudice" encompasses both a qualitative and quantitative component. *See United States v. Duperval*, 777 F.3d 1324, 1332 (11th Cir. 2015) ("The court should first determine if the material raises serious questions of possible prejudice. If it does, the court should then determine the likelihood that the damaging material has in fact reached the jury."); *United States v. Aragon*, 962 F.2d 439, 444 (5th Cir. 1992) ("First, the district court must look at the nature of the news material to determine whether the material is innately prejudicial. Second, the court must then discern the probability that the publicity has in fact reached the jury."); *Ladner v. State*, 868 S.W.2d 417, 423 (Tex. App. 1993) (adopting two-part approach).

With respect to the qualitative component, the relevant inquiry is whether the content of the communication was substantially prejudicial to the defendant's case. Relevant considerations include, but are not limited to: "(1) whether the publicity goes beyond the record or contains information that would be inadmissible at trial, (2) how closely related the material is to matters at issue in

the case, (3) the timing of the publication during trial, and (4) whether the material speculates on the guilt or innocence of the accused." *State v. Holly*, 201 P.3d 844, 849 (N.M. 2009). There can be little doubt that the news item here satisfies the first component. The defendant contested identity during the course of trial, highlighting the lack of physical evidence connecting him to the crime. A news report wrongly stating that the police had palm print evidence connecting the defendant to the attack went to the heart of the case.

With respect to the quantitative component, only a publication creating a reasonable inference the jury was exposed to the publication jeopardizes the defendant's right to fair trial. *See, e.g.*, *Mu'Min,* 500 U.S. at 427-28 (discussing the "extraordinary publicity" required to jeopardize the right to fair trial); *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (discussing the threshold level of pervasive media coverage required to jeopardize the right to fair trial and rejecting "the proposition that juror exposure . . . to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process"); *Irvin v. Dowd*, 366 U.S. 717, 725 (1961) (discussing the "barrage of newspaper headlines, articles, cartoons and pictures was unleashed against [the defendant] during the six or seven months preceding his trial" and explaining approximately 95% of the households in the vicinage were exposed to such reports); Gabriel G. Gregg, *ABA Rule 3.6 and California Rule 5-120: A Flawed Approach to the Problem of Trial Publicity*, 43 UCLA L. Rev. 1321, 1365 (1996) ("There is, however, very little hard evidence that demonstrates that juries are prejudiced by trial publicity. In fact, most tests and studies that have examined the prejudicial

effect of trial publicity on juries have been quite inconclusive: Scientific research has not revealed a strong connection between trial publicity of any sort and jury prejudice."). In an increasingly fractured market for news distribution and consumption—the decline of traditional media and the rise of websites, blogs, tweets, and social media—the mere fact news was published anywhere, standing alone, does not necessarily give rise to an inference of juror exposure requiring further inquiry. *See Bierman v. Weier*, 826 N.W.2d 436, 468-69 (Iowa 2013) (Hecht, J., concurring in part and dissenting in part) (explaining technological change facilitating greater publication of information from individuals blurs the legal distinction between traditional news media and smaller publishers of information); *Frank*, 298 N.W.2d at 327 ("We will not presume prejudice from the mere publication or broadcast of news stories. The trial court need not act on mere speculation."). For example, would prejudicial information published in a single post on an infrequently read blog or in a single tweet from a largely unfollowed Twitter account, although both technically published and accessible to the jury, trigger the court's duty to poll the jury? We think not. Thus, the court's duty to inquire further is only invoked where there is sufficient evidence to establish the communication or communications at issue were disseminated with sufficient frequency and breadth to afford a reasonable inference that a member of the jury more likely than not would have been exposed to the communication or communications at issue. *See Duperval*, 777 F.3d at 1332; *Aragon*, 962 F.2d at 444; *Harper v. Ballard*, No. 2:13-7421, 2015 WL 1431164, at *24 (S.D.W. Va. Mar. 27, 2015) (stating the mid-trial publicity must be "so invasive that the setting

of the trial becomes inherently prejudicial" and that "[m]erely citing to media coverage . . . is not enough"); *Harper v. People*, 817 P.2d 77, 85 (Colo. 1991) ("The circumstances of the article's publication present a reasonable possibility of jury exposure.").

Relevant considerations into this second component include the profile or visibility of the publisher in the relevant community, the prominence of the information within the publication, the frequency of publication, whether the information has been published by multiple sources, whether the information has been published across different media platforms. *See Harper*, 817 P.2d at 85; *Holly*, 201 P.3d at 849. Another relevant consideration is whether the jury has been "been clearly admonished not to expose themselves to media publicity of the trial in which they are serving as jurors." *Frank*, 298 N.W.2d at 324; *see also Bailey v. State*, No. 05-13-01536-CR, 2015 WL 1649946, at *4 (Tex. App. Apr. 13, 2015) (concluding defendant did not establish prejudice where the jury was admonished). If so, "a presumption arises that they will not violate that admonition." *Frank*, 298 N.W.2d at 324. Only a strong showing of mid-trial publicity substantially prejudicial to the defendant's case and likely to reach the jury should overcome the presumption. Finally, we are cognizant of the fact that "[t]he judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror." *Mu'Min*, 500 U.S. at 427.

We cannot conclude the district court erred in refusing to question the jurors individually during deliberations or abused its discretion in failing to do so on its own motion. In this case, the news article was posted to the website of the Cedar Rapids Gazette, a prominent newspaper in the locality. There is no information in the record regarding when the article was originally posted to the website or what updates were made after the time of the original posting. There is no information in the record regarding the placement or prominence of the news article on the website. There is no information in the record regarding the number of page views. The district court clearly admonished the jury to not access news media during trial. There is nothing in the record demonstrating the news item was republished by other sources. Nor is there anything in the record establishing similar information was published by other sources. We hold that a single news item posted on the website of a local newspaper containing misinformation regarding the defendant's trial, without more, does not raise "serious questions of possible prejudice" requiring the district court to interrupt jury deliberations and question the jurors individually. *See Bigley*, 202 N.W.2d at 58; *see also United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974) ("We do not hold that every newspaper article appearing during trial requires such protective measures. Unless there is substantial reason to fear prejudice, the trial judge may decline to question the jurors."); *Tunstall v. Hopkins*, 126 F. Supp. 2d 1196, 1206 (N.D. Iowa 2000) (explaining the constitutional right to due process is implicated by mid-trial publicity only where the mid-trial publicity is "so

massive, inflammatory, widespread and pervasive that prejudice ought to have been presumed").

## IV.

For the foregoing reasons, we affirm the defendant's convictions and sentences.

**AFFIRMED.**