# IN THE COURT OF APPEALS OF IOWA

No. 19-1981
Filed April 14, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ANNETTE DEE CAHILL,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Muscatine County, Patrick A. McElyea, Judge.

Annette Cahill appeals the judgment and sentence entered after a jury found her guilty of second-degree murder. **AFFIRMED.**

Elizabeth A. Araguás of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Annette Cahill appeals the judgment and sentence entered after a jury found her guilty of second-degree murder. She challenges the court's rulings on the State's failure to disclose evidence and the court's refusal to exclude the testimony of three witnesses at trial. Cahill also challenges the sufficiency of the evidence to support the jury's verdict and contends her constitutional rights were violated by the twenty-six-year delay between the crime and her arrest.

**I. Background Facts and Proceedings.**

Corey Wieneke died on October 13, 1992, after sustaining multiple blunt force injuries, including one that fractured his skull. Jody Hotz, Wieneke's fiancé, saw him when he returned to their West Liberty home that morning after he had worked his shift as a bartender. Wieneke was asleep when Hotz left to begin her 8:30 a.m. shift at a bank. When she returned home around 6:30 or 6:45 p.m., Hotz noticed some things out of the ordinary. The dog was outside and unchained. The screen door to the home was wide open. Wieneke's car was in the driveway—he should have been at work. The main door to the house was unlocked. Hotz went inside and found Wieneke dead on the bedroom floor. No property was missing from the home. Hotz went out and dialed 9-1-1.

At around 1:30 p.m. that day, a farmer drove by Wieneke's house and saw a metal baseball bat on the side of the road near the house that had not been there when he drove by that morning. Traces of blood found on the bat matched Wieneke's blood type. Wieneke's injuries reflected the kind of injuries inflicted by a baseball bat generally, and the injury pattern on Wieneke's back matched those that one could inflict with the baseball bat found near the residence.

Law enforcement investigated many possible suspects in Wieneke's death. They investigated Cahill, who was one of four women Wieneke had a relationship with at the time of his death. But Cahill told investigators that she was shopping in Iowa City with Jacque Hazen, her sister-in-law, on the day of the murder, and Hazen produced store receipts to support the claim. And no physical evidence linked Cahill to the murder.

The investigation waned until new information was disclosed during a chance encounter in December 2017. Iowa Department of Criminal Investigation (DCI) Special Agent Trent Vileta met Jessica Becker, a nurse, while at a hospital to interview a witness in an unrelated matter. When Agent Vileta told Becker he worked on "cold cases," Becker told him about an event she witnessed in 1992, when she was nine years old. Becker was friends with Hazen's daughter and attended a sleepover in Hazen's home sometime after Wieneke's murder. Becker and her friend left the bedroom to sneak downstairs after their bedtime. When they neared the bottom of the stairs, Becker heard Cahill in the dining area and saw her "from the back side." Becker recalled that Cahill was facing away from the stairs and was "crying and sobbing" while lighting black candles. Becker heard Cahill make several statements like, "Corey, I never meant to hurt you," "Corey, I'm so sorry," "I never meant to kill you, Corey," and "Corey, I love you." Before Cahill could notice them, Becker and her friend turned around and went back upstairs. Becker told her mother about the incident shortly after, but her mother did not go to law enforcement because she feared retaliation.

With the new information from Becker, investigators began looking into Wieneke's death again. One potential witness they spoke to was Scott Payne,

who was friends with Hazen and her husband in 1992. A DCI report from an interview with Payne in 1996 detailed that "Scott Payne stated that [Cahill] was seen burning a bunch of stuff after Wieneke was killed," suggesting Payne received the information from another source. That information concerned a rumor that Cahill burned a diary. When Payne was re-interviewed, he recalled seeing Cahill burning bloodstained clothing in a barrel at Hazen's house one or two days after Wieneke's death. Cahill claimed that she was burning the clothes because they were covered in paint. But Payne, who had worked butchering hogs for IBP, believed there was blood rather than red paint on clothing.

In June 2018, the State filed a trial information, alleging Cahill committed first-degree murder by killing Wieneke willfully, deliberately, premeditatedly, and with malice aforethought. Cahill's first trial resulted in a mistrial after the jury deadlocked. During Cahill's second trial, the State discovered that one page of a DCI criminalistics lab report was captioned incorrectly and left out of the investigative file. A draft of the lab report, which included the missing page, states that the human hairs found in Wieneke's left hand at the crime scene were not suitable for DNA STR analysis.[1] The State conceded it could not offer the draft report into evidence, and so defense counsel did not think there was any "fighting issue" over the report.

---

[1] The page states: "A slide mailer from exhibit K contained two glass slides. Slide #1 contained animal hairs and synthetic fibers. Slide #2 contained several animal hairs and human hairs; however, none of the human hairs were suitable for DNA STR analysis." Laboratory exhibit K was a box containing hairs from Weineke's left hand.

At the close of Cahill's second trial, the jury returned a verdict finding her guilty of second-degree murder. Cahill filed post-trial motions, including a motion to compel discovery relating to the hairs found in Wieneke's hand. She asked that the State provide any other information about the testing that was performed on the hairs and to arrange mtDNA testing if the evidence was still in the DCI's possession. If the evidence was lost or destroyed, Cahill asked the court to order the State to explain its loss or destruction and grant her a new trial based on a *Brady*[2] violation and "the unfairness of the jury lacking a spoliation instruction based on this destroyed evidence." After a hearing, the court denied Cahill's motion and sentenced her to a period of incarceration not to exceed fifty years.

## II. Motion to Compel.

On appeal, Cahill first challenges the court's denial of her motion to compel testing of the four hairs found on Wieneke's hand at the crime scene. The court ruled on Cahill's post-trial motions on the record at the start of the sentencing hearing. In doing so, the court addressed Cahill's claim that she is entitled to a new trial based on newly discovered evidence, which included the hairs. The court noted that Cahill knew that hair was recovered from Wieneke's hand because the information was in the discovery materials[3] and counsel questioned witnesses at trial about whether the hair was tested. Although the court recognized that Cahill did not learn that the DCI tried to test the hair until trial, it found the State's failure

---

[2] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that due process requires the prosecution to disclose exculpatory evidence to the accused).

[3] A DCI lab report described Laboratory exhibit K as a "Box containing hairs from victim's left hand." The report stated: "Numerous hairs and fibers were recovered from exhibit K. An inventory of the hairs and fibers showed numerous cat hairs, 4-Caucasian head hairs, and yellow trilobal synthetic fibers."

to disclose that attempt "did not impact the[] opportunity to discover the hair and to discover the opportunity to test the hair." Nor did the court find the evidence was material or would have likely changed the outcome of trial:

> It would be reasonable to test the hairs found in Corey Wieneke's hand against [Cahill]'s DNA, Corey's DNA and Jody Hotz's DNA. However, as discussed during the hearing if the results came back that the hair didn't match any of those people, the jury would only be in a slightly better position than they were during the trial. The court does not find that it would probably change the result of the trial. There would still be more questions than answers. And the defense was able to create those questions by asking witnesses about the hairs and developing a line of questioning that indicated they hadn't been tested and no one knew whose hairs they were. That would be the same purpose if the hair was tested and found not to be the hair of Annette Cahill, Jody Hotz or Corey Wieneke. And the court does not find that it's reasonable or feasible for the State to test the hair against every possible suspect that the defense has raised throughout this proceeding.

The court then reviewed the other issues raised in the post-trial motions, denied the motions for new trial and in arrest of judgment, and stated, "[F]or the reasons previously stated regarding the hair and the DCI report and the DNA testing the motion to compel is also denied."

On appeal, Cahill argues she is entitled to DNA testing of the hair under Iowa Code section 81.10 (Supp. 2019). This section provides a way for those convicted of a felony or misdemeanor to obtain DNA profiling on a sample collected in the case. Iowa Code § 81.10. Cahill's post-trial motion did not cite to section 81.10, the parties did not discuss it at the hearing on the motion, and the court did not mention it in denying Cahill's motion. The State argues Cahill failed to preserve error because the court never considered or ruled on a claim under section 81.10.

Assuming, without deciding, Cahill preserved error on this claim, we find she has failed to make the required showing for DNA profiling under section 81.10.

To grant an application for DNA profiling, the court must find the results would be "material to, and not merely cumulative of or impeaching of, evidence included in the trial record" and "would raise a reasonable probability that the defendant would not have been convicted if such results had been introduced at trial." Iowa Code § 81.11(1)(d), (e). In rejecting Cahill's motion for new trial under Iowa Rule of Criminal Procedure 2.24(2)(b)(8), the court found Cahill was unable to prove the materiality of the evidence or a likelihood of a different result at trial even if DNA testing showed the hair belonged to someone other than Cahill, Wieneke, or Hotz. The court noted that defense counsel created questions about the identity of the perpetrator based on the hairs found in Wieneke's hand even without DNA testing. This occurred during cross-examination of one of the DCI investigators who investigated Wieneke's death in 1992:

> Q. So it appears to me that we can conclude that there were hairs collected from the victim's hand and . . . placed into a custody bag or something like that and sent to the DCI lab. Would that be a fair conclusion from this document? A. It appears that that's correct.
> Q. . . . [Was] there testing of the Caucasian head hairs that you're aware of? A. I do not know that.
> Q. You don't know whether they were compared to Annette Cahill or any other suspects? A. I do not know that.
> . . . .
> Q. And as an experienced detective do hairs in the hand of a dead man who has been beaten in his bedroom with 13 blows tell you anything? A. Well, certainly they'd be collected as evidence to see what they did show.
> Q. But despite any testing you don't have to be Columbo to figure out that hairs in the hand might indicate a struggle, right? A. Well, that's possible. They may also be the hair from the individual, the hair from someone else sleeping in the bed. It appears from the report that there's also cat hairs, so I don't know.
> Q. Are you familiar with any followup investigation of those human hairs that were found in the left hand of the victim? A. I am not.

Defense counsel then referred to this testimony during closing argument:

> Let's revisit the human hair evidence. There were four human hairs in the victim's left hand. State has presented no evidence that the human hairs matched Annette's hair either by microscopic comparison with known hairs through slides or by DNA comparison. Moreover, the hairs tell us it is unlikely Corey was unaware of his assault. The fact he was an experienced fighter, weighed 230 pounds and was a football player make it unlikely that there was only one assailant unless that was someone powerfully built.
>
> The evidence seems to indicate a struggle. There were 13 blows, not 12. They were all inflicted while Corey was alive. There was a mark above the door. There was splatter and you've seen the pictures. So none of this evidence that we do have comports with Annette Cahill going over and pummeling or however you want to describe it, killing the man she loved with a bat. None of it. Nor with all of this blood, the hairs, the clothing, the tennis shoes, everything examined is there a scintilla of actual evidence that proves beyond a reasonable doubt element one of the checklist the County Attorney promised he would check off for you that Annette Cahill struck Corey Wieneke.

Even if DNA profiling showed the hairs belonged to someone other than Cahill, the evidence would be cumulative and unlikely to have changed the result of trial. The district court did not err in denying Cahill's post-trial motion to compel DNA testing of the hairs.

Cahill also argues the failure to produce the lab report about the hair testing violated her due process rights under *Brady.* The State again contests error preservation. Cahill moved for new trial in part based on a violation of her right to receive a fair and impartial trial. Though she did not cite *Brady*, she argued the State's failure to provide the DCI lab report until after trial began impeded her ability to present a complete defense. The district court never addressed a *Brady* violation in denying her post-trial motions.

Again, assuming, without deciding, Cahill preserved error, we are unable to find a violation of *Brady.* "In order to establish a Brady violation, the defendant had to prove '(1) the prosecution suppressed evidence; (2) the evidence was favorable

to the defendant; and (3) the evidence was material to the issue of guilt.'" *Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003) (citation omitted). Evidence is suppressed under *Brady* when information is discovered after trial that had been known to the prosecution but not the defense. *See id.* But Cahill knew hairs were found in Wieneke's hand at the crime scene, as shown by discovery materials and her counsel's cross-examination of the DCI investigator. The information not disclosed until after trial began was the fact that the State did not conduct DNA STR testing because the hairs were not suitable for that type of analysis. The information was not evidence but a basis for Cahill to argue the State's investigation was subpar and that additional DNA testing of the evidence was necessary. In any event, we do not find the information favorable to Cahill nor material to the issue of her guilt. Cahill has not established a *Brady* violation regarding the laboratory report disclosed by the State mid-trial.

### III. Admissibility of Witness Testimony.

Cahill next challenges the district court's rulings on motions brought under Iowa Rule of Evidence 5.104. That rule requires that "the court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." Iowa R. Evid. 5.104(a). We review the court's preliminary ruling on the question of admissibility for correction of legal error. *See State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020). But we give deference to the court's fact findings and uphold those findings if supported by substantial evidence. *See id.*

Before her first trial, Cahill moved the court to exclude the testimony of Becker and Becker's mother. When the State identified Payne as a witness before

her second trial, Cahill also moved the court to exclude Payne's testimony. Cahill sought to exclude the testimony of all three witnesses on the same ground, arguing their claims are so impossible, absurd, and self-contradictory that they should be deemed a nullity by the court. The court denied both motions. Cahill challenges those rulings on appeal.

Cahill's argument touches on an important distinction between the roles of the court and jury. The job of determining witness credibility and assigning weight to the evidence generally falls to the jury, not the court. *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) ("It is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." (citation omitted)); *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive."). And "a court must be careful not to usurp the role of a jury by making credibility determinations that are outside the proper scope of the judicial role." *State v. Paredes*, 775 N.W.2d 554, 567 (Iowa 2009). But there is an exception:

> The rule that it is for the jury to reconcile the conflicting testimony of a witness does not apply where the only evidence in support of a controlling fact is that of a witness who so contradicts himself as to render finding of facts thereon a mere guess. We may concede that, ordinarily, contradictory statements of a witness do not make an issue of fact; and that such situation may deprive the testimony of all probative force.

*State v. Mitchell*, 568 N.W.2d 493, 503 (Iowa 1997) (citation omitted).

Does the testimony at issue fall into this exception? Cahill claims Becker's testimony is "impossible" for the following reasons: (1) Becker could not have

viewed Cahill in the dining area while standing on the stairs because the stairway was fully enclosed and with a door at the base that opened out and away from the stairs; (2) Becker was unable to recall other details of the home's layout even though she claimed to have spent the night there many times over the years; (3) and Becker did not recall the date of the sleepover or whether other children were present that night.[4]   As for Payne's testimony, Cahill cites contradictions between statements he made to law enforcement in 1996 and 2019 and claims Payne was biased because he gave the Hazen family a $5000 loan that they never repaid.   But these concerns are more appropriately weighed by the jury in determining the credibility of their testimony.  *See State v. Frake*, 450 N.W.2d 817, 819 (Iowa 1990) ("When determining the credibility of the testimony of witnesses, the [trier of fact] may consider whether the testimony is reasonable and consistent with other evidence, whether a witness has made inconsistent statements, the witness's appearance, conduct, memory and knowledge of the facts, and the witness's interest in the trial."); *see also State v. Tyler*, 830 N.W.2d 288, 296-97 (Iowa 2013) ("In making credibility determinations, we examine extrinsic evidence for contradictions to that witness's testimony.  We also examine a witness's testimony for internal inconsistencies in making credibility determinations." (internal citation omitted)).   And the limitation on the jury's ability to determine

---

[4] Although Becker could not recall a door at the bottom of the stairs in 1992, she testified that if it was there it was open on that night.  And Becker's inability to recall the entire layout of the home of a friend she had when she was nine years old—especially details likely inconsequential to her at the time, like the location of the parents' bedroom—is unsurprising considering the time that has passed.  Finally, though Becker could not recall whether any other friends were at the sleepover on that night, she was sure that only she and Hazen's daughter witnessed Cahill in the dining room.

witness credibility does not apply if there is corroboration of the testimony or when there is an explanation for conflicting statements. *See State v. Frank*, 298 N.W.2d 324, 329 (Iowa 1980). The court did not err in refusing to exclude the witnesses' testimony.

**IV. Sufficiency of the Evidence.**

Cahill also challenges the sufficiency of the evidence to support the jury's finding she committed second-degree murder. We review such claims for correction of errors at law. *See State v. Benson*, 919 N.W.2d 237, 241 (Iowa 2018). We will uphold the verdict if it is supported by substantial evidence. *See id.* Evidence is substantial if, when viewed in the light most favorable to the State, it could convince a rational factfinder that the defendant is guilty beyond a reasonable doubt. *See id.*

In arguing there is insufficient evidence to show she committed the murder, Cahill notes that she never confessed to the crime and the State never produced (1) physical evidence connecting her to the scene of the crime; (2) an eyewitness to the crime; (3) an eyewitness placing her with the murder weapon; and (4) a witness who was aware of any plan she had to kill Wieneke. The only evidence connecting Cahill to the crime was Becker's testimony that she witnessed a distraught Cahill make statements of her guilt, which was corroborated by Becker's mother, and Payne's testimony that he saw Cahill burning bloody clothing within days of the murder.

Although the evidence of Cahill's guilt is not overwhelming, when it is viewed in the light most favorable to the State, we are unable to find that it falls short of the substantial-evidence threshold. Cahill was one of several women with

whom Wieneke was romantically involved. The night before his murder, Cahill was at the bar where Wieneke worked as a bartender. After his shift, Wieneke intended to go home with another woman but found Cahill sitting in his car. Eventually, Wieneke decided to drive Cahill home. Cahill became upset during the drive and tried to get out of the car as it was moving. Wieneke stopped the car, and he and Cahill got out and had a conversation. Both got back in the car, and Wieneke drove back to the bar where the other woman's car was parked. Wieneke said he would take Cahill home and then go to the woman's home. He later stopped at the other woman's home. By morning, Wieneke was back at the home he shared with Hotz, who last saw Wieneke asleep when she left for work that morning. When Hotz returned home that evening, she found Wieneke dead on the bedroom floor. The window of time in which the murder occurred is narrowed by the testimony of a farmer who drove past Wieneke's home that day. When he drove by after 9:00 a.m., he saw two people standing outside the home by a car. When he drove by around 1:30 p.m., he noticed a metal baseball bat on the side of the road that had not been there that morning. The baseball bat matched Wieneke's injuries, and trace amounts of blood that matched Wieneke's blood type was found on it.

During the time frame of Wieneke's murder, Cahill spent time at a construction jobsite but left when Hazen picked her up after between one hour and one and one-half hours later. Hazen testified she picked Cahill up at the jobsite around 10:00 a.m. and that they stopped at Wieneke's house on the way to Iowa City. She said Cahill wanted to drop something off, but no one answered the door. Cahill and Hazen claimed they went to Iowa City to run errands, and Hazen

provided receipts of purchases she made for corroboration. But the only receipt with a timestamp showed a purchase made at 1:25 p.m.

The strongest evidence of Cahill's guilt is Becker's testimony about the events she witnessed when she was nine. The defense tried to discredit her testimony by emphasizing every possible inconsistency, as well as Becker's inability to recall certain details. Even so, the jury found her credible—perhaps based on the accidental way in which she crossed paths with Agent Vileta while he was investigating an unrelated crime twenty-six years later. The defense tried to discredit Becker by portraying her as biased based because Cahill had an extramarital relationship with Becker's stepfather when Becker was young. But it is hard to conceive that Becker invented a story to portray Cahill as a murderer in the hope that she could one day share it during a coincidental meeting with a law enforcement officer. And Becker's mother testified that Becker told her about the incident not long after, which corroborates her claim. Her testimony is also corroborated by Payne, who saw Cahill burning clothing two days after Wieneke's murder. The evidence was sufficient to support the jury's verdict, so the district court did not err in denying Cahill's motion for new trial.

**V. Delay in Prosecution.**

Cahill's final claim on appeal concerns the twenty-six years that passed between when the crime occurred and her arrest. Cahill argues that the delay in her prosecution violated her due process rights. We review her claim de novo. *See State v. Brown*, 656 N.W.2d 355, 362 (Iowa 2003).

Although the State need not arrest and charge the accused "at the precise moment probable cause comes into existence," it cannot delay the filing of criminal

charges against the accused to gain a tactical advantage. *Id.* (citation omitted). To prove a delay in prosecution violated her due process rights, Cahill must show that the delay in prosecution caused her actual prejudice and was unreasonable. *See id.* Actual prejudice occurs when the delay leads to a loss of evidence or testimony that meaningfully impairs the ability to present a defense. *See id.* Generalized claims of prejudice based on loss of memory, witnesses, or evidence will not suffice. *See id.*

Even assuming the delay caused prejudice, Cahill cannot show the delay was unreasonable. The State did not delay prosecution to gain tactical advantage. Rather, the State lacked sufficient evidence of Cahill's involvement until December 2017, when Agent Vileta spoke to Becker. The State did further investigation and filed charges against Cahill six months later. Under the circumstances, there was no unreasonable delay in prosecution. A defendant cannot complain about a delay in prosecution of a crime when that delay is attributable to the defendant's success in concealing guilt. Delaying prosecution to allow full investigation differs fundamentally from delaying prosecution for tactical advantage. *United States v. Lovasco*, 431 U.S. 783, 795 (1977). By waiting to prosecute a defendant until guilt beyond a reasonable doubt can be established promptly, the prosecutor is abiding by standards of fair play and decency rather than deviating from them. *See id.*

> Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive [the defendant] of due process, even if [the] defense might have been somewhat prejudiced by the lapse of time.

*Id.* (internal citation omitted).  Cahill's due process rights were not violated by the pre-accusation delay in prosecution.

For all the above reasons, we affirm Cahill's second-degree murder conviction.

**AFFIRMED.**