**STATE of Iowa, Appellee,**

v.

**Deny Wilson BROWN, Appellant.**

No. 02–0076.

Supreme Court of Iowa.

Jan. 23, 2003.

Kevin E. Hobbs, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, John P. Sarcone, County Attorney, and Joe Weeg, Assistant County Attorney, for appellee.

CADY, Justice.

This appeal presents three issues arising from the prosecution of a criminal case involving a murder that occurred nearly twenty-six years ago. The first issue centers on the admissibility of statements by another alleged assailant, relayed by a "jailhouse snitch," implicating the defendant in the murder. The second focuses on whether the delayed prosecution of the defendant amounts to a violation of the defendant's due process rights. The final issue is whether trial counsel was ineffective. We affirm the judgment and sentence of the district court.

## I. Background Facts and Proceedings.

On February 4, 1977, the body of A.W. "Bud" Wingler was found in the front seat of his car, which was parked at the intersection of 37th and Center Streets in Des Moines. Wingler had been shot three times with a .45 caliber weapon, once in the head and twice in the shoulder. Interviews with area residents indicated the car had been parked at the location sometime during the late evening of February 3 or the early morning of February 4. There were no witnesses to the shooting and no one saw an assailant or assailants leaving the scene. Three shell casings were found in the car. Two slugs were also recovered. The keys to the vehicle were not in the car or on Wingler's person. Wingler's wallet and some of his jewelry were also missing. His wallet, along with a .45 caliber handgun, a .45 caliber slug, and a brown glove were found in a wooded area in Des Moines six weeks later.

Des Moines Police Department investigators were able to establish that Wingler had spent a portion of the evening of February 3 with a close female friend, but a clear picture of the events that followed after she left his company eluded them. Moreover, despite an extensive investigation, which included numerous interviews with various individuals, no clear suspect or suspects materialized. At the end of 1977, the case remained unsolved. In fact, aside from an occasional new lead, the case languished without any real development for over ten years.

In October 1989, James Burrows, an inmate at the Anamosa State Penitentiary, contacted the Des Moines police. Burrows indicated he had information pertinent to the long-dormant Wingler investigation. An investigator was soon sent to interview Burrows, who provided the police with a detailed description of Wingler's murder.

Burrows explained that he and two acquaintances, Gary Thrasher and the appellant, Deny Brown, had gone to Wingler's apartment in West Des Moines on February 3, 1977, intending to rob Wingler after he returned from dinner. Brown and Burrows later confronted Wingler in his garage upon his arrival home at the apartment complex. At that point, Burrows claimed, the men planned to rob Wingler

of his money and jewelry and escape to a getaway car, driven by Thrasher, which waited nearby. Brown deviated from this plan, however, by first ordering Wingler into the passenger seat of his car and then ordering Burrows to drive the car away from the apartment complex. Thrasher followed in the other vehicle. Then, as the men drove east along Interstate 235 toward downtown Des Moines, Brown shot and killed Wingler. He then ordered Burrows to exit the highway and park the car. Brown and Burrows left Wingler's car, got in Thrasher's car, and the three men left the scene. Later, Brown hid the murder weapon and some of Wingler's possessions in a tree stump near Brown's apartment. Brown and Burrows later sold a ring stolen from Wingler and combined the profit with money they had taken from his wallet. Both men took a portion of the total profit from the robbery. Burrows could not say whether Thrasher received a portion, partially because Thrasher had cut his ties with the men due to his apparent concern over Brown's deviation from the original robbery plan. Brown and Burrows soon ended their association as well, and had little contact with each other after the robbery and murder.

Little is known about the course of events immediately after Burrows provided his story to the police. However, the new developments in the case were presented to the Polk County Attorney's Office, which, for unknown reasons, declined to charge Brown, Burrows, or Thrasher for their alleged roles in the crime. The investigation went dormant once more.

In early 2001, the investigation into the unsolved Wingler murder was reopened, ostensibly at the behest of the victim's daughter. The Des Moines police contacted a number of persons once again, including Burrows. The evidence in the case was reassessed. More importantly, two individuals, Kenny Bevard and Jeffrey Nall, came forward claiming Brown had made incriminating statements while incarcerated for another offense. Another inmate, Christopher Hawk, came forward claiming Thrasher also had made incriminating statements while incarcerated, including statements implicating Brown in Wingler's murder. Bevard and Nall testified in depositions that Brown admitted to them that he shot Wingler. In particular, Bevard testified Brown told him intimate details of the crime during the period of time the men were cellmates. Hawk testified in a deposition that Thrasher told him he never would have been implicated in the crime if Brown had not confessed to a cellmate. The new information provided by Hawk, Bevard, and Nall, combined with the existing information in the case, was once again presented to the Polk County Attorney's Office. This time, the county attorney, who was not in office in 1989, decided that a prosecution was warranted. Gary Thrasher and Deny Brown were soon arrested and charged with murder.

As Brown's trial date approached, the parties sought a preliminary determination of the admissibility of Hawk's testimony of Thrasher's statement pertaining to Brown. The district court held that Hawk's testimony was admissible. On November 5, 2001, Brown stipulated to a trial on the minutes of testimony provided in his case. The minutes included summary statements of numerous individuals interviewed between 1977 and 2001 as well as the contents of the depositions of Hawk, Bevard, and Nall. Brown was found guilty of murder in the second degree in violation of sections 690.1 and 690.3 of the 1977 Code of Iowa and was later sentenced in a manner tailored to 1977 sentencing standards.[1]

1. Iowa Code sections 690.1 to 690.3 (1977) provided:

On January 7, 2002, Brown filed timely notice of appeal from the guilty verdict and sentencing. He raises three issues on appeal.

## II. Hearsay Issues.

Brown's first assertion on appeal is that the trial court committed reversible error by admitting and considering the statements of Gary Thrasher as relayed by Christopher Hawk.[2] Brown believes Hawk's testimony amounted to double hearsay not within an exception to the Iowa Rules of Evidence. *See* Iowa R. Evid. 5.805. Moreover, he argues that the admission of the testimony violated his right to confront a witness against him in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. U.S. Const. amend. VI. In resistance, the State first urges that Brown failed to preserve these issues for appeal. In the alternative, the State argues that Thrasher's statement was admissible under an exception to the hearsay rule and does not violate the Confrontation Clause. The State also believes that

Brown was not prejudiced by the admission of the Thrasher statements given the other inmates' testimony conveying statements made by Brown implicating himself in Wingler's murder.

### 1. Preservation of Error.

 We consider first the State's argument that Brown failed to properly preserve the hearsay and Confrontation Clause issues for appeal by stipulating to the minutes of testimony without specifically renewing his pretrial objection to Hawk's testimony. An examination of the record reveals that Brown objected to the use of Hawk's testimony on a number of occasions before his stipulation, but later stipulated, without objection, to minutes that included the very same statements to which he had earlier objected. Generally, a stipulation to the admission of testimony at trial constitutes a waiver of any objection to the testimony raised prior to trial. *See State v. Terry*, 569 N.W.2d 364, 368–69 (Iowa 1997); *State v. Schmidt*, 312 N.W.2d 517, 518 (Iowa 1981); *see also State v. Bergmann*, 633 N.W.2d 328, 332 (Iowa

---

**690.1 Murder.** Whoever kills any human being with malice aforethought, either express or implied, is guilty of murder.

**690.2 First-degree murder.** All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, or burglary, is murder in the first degree, and shall be punished by imprisonment for life at hard labor in the penitentiary and the court shall enter judgment and pass sentence accordingly.

**690.3 Second-degree murder.** Whoever commits murder otherwise than as set forth in section 690.2 is guilty of murder in the second degree, and shall be punished by imprisonment in the penitentiary for life, or for a term of not less than ten years.

Similar, albeit amended, versions of these statutes are found in Iowa Code sections 707.1 to 707.3 (2001).

2. Christopher Hawk testified, in part:

A. ... he [Thrasher] would talk to somebody through the door about his codefendant which I believe is—I never meet him—met him before. I don't know him—was—he just said Deny.

Q. That's the word he used was Deny to identify him? A. No. Fall partner.

Q. Fall partner? A. Somebody he got arrested with.

Q. Okay. So what did he say? A. His codefendant. And he's used codefendant before too. And he said he told somebody—well, what he told me, he says, "We could have got away with it had my fall partner not said anything in his block." He said he ran his mouth off in the block to somebody and they have turned State's evidence against him and now they were both hung....

2001). This appeal, however, presents a situation distinguishable from our prior considerations of this type of preservation issue.

Our prior considerations in this area arose from situations in which the defendant, through trial counsel, *affirmatively* consented to the admission of specific testimony or other evidence at trial that had been subject to a prior objection. *Bergmann*, 633 N.W.2d at 332; *Terry*, 569 N.W.2d at 368–69; *Schmidt*, 312 N.W.2d at 518. In this situation, Brown did not affirmatively and specifically consent to the admission of Hawk's testimony at the bench trial, but generally stipulated that the district court could consider the minutes of testimony. Moreover, the record reveals the parties, as well as the trial court, understood the pretrial objections and the court's ruling on the admissibility of Hawk's testimony would be sufficient to preserve the issue at the stipulated trial. Although Brown did not specifically renew his objection to this testimony at the time of his stipulation and bench trial, the district court indicated during the course of the trial that it intended to consider Hawk's testimony, yet further expressed its understanding that Brown was not waiving his "right to argue" on appeal that the objectionable statements should have been excluded. The preservation of error doctrine is grounded in the idea that a specific objection to the admission of evidence be made known, and the trial court be given an opportunity to pass upon the objection and correct any error. *See Sievers v. Iowa Mut. Ins. Co.*, 581 N.W.2d 633, 638 (Iowa 1998). Under the circumstances of this case, the spirit of the rule was met. We conclude Brown preserved error.

2. **Hearsay and Confrontation Analyses.**

■ Although the hearsay rule and Confrontation Clause are "designed to protect similar values," they "are not to be equated with each other." *State v. Rojas*, 524 N.W.2d 659, 664 (Iowa 1994.) For this reason, a number of differences between the analyses of these related issues have developed over time. For example, we review the admission of hearsay for errors at law, while Confrontation Clause issues are reviewed de novo. *State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000). Despite their differences, however, both the hearsay rule and the Confrontation Clause operate to prevent the wrongful admission of testimony to the prejudice of a defendant. *See Rojas*, 524 N.W.2d at 664. Neither rule requires the reversal of a judgment if the defendant suffered no prejudice or harm from the admission of inadmissible testimony. *See State v. Kite*, 513 N.W.2d 720, 721 (Iowa 1994); *State v. Sowder*, 394 N.W.2d 368, 372 (Iowa 1986).

■ There are two distinct tests to apply to determine whether the admission of inadmissible testimony is non-prejudicial or harmless under the two rules. In the hearsay context, "where substantially the same evidence is in the record, erroneously admitted evidence will not be considered prejudicial." *Sowder*, 394 N.W.2d at 372; *see also State v. McGuire*, 572 N.W.2d 545, 547–48 (Iowa 1997). For Confrontation Clause purposes, "the State must establish that the error was harmless beyond a reasonable doubt." *Kite*, 513 N.W.2d at 721; *see also State v. Coy*, 433 N.W.2d 714, 715 (Iowa 1988). In making the Confrontation Clause assessment, a court must look at:

[T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross examination otherwise permitted,

and, of course, the overall strength of the prosecution's case.

*Kite,* 513 N.W.2d at 722 (citation omitted).

■ Even assuming Thrasher's testimony was inadmissible, we do not believe Brown was prejudiced by its admission. In this case, "substantially the same evidence" was in the record, and was provided by Brown's own admissions to two other inmates, Kenny Bevard[3] and Jeffrey Nall.[4] *See* Iowa R. Evid. 5.801(d)(2). For this reason, even if Hawk's testimony was erroneously admitted, Brown suffered no prejudice from its admission under the hearsay analysis. In addition, when considering Hawk's testimony in light of the testimony of Bevard and Nall and the other evidence in the case, we are convinced that the admission of Hawk's testimony was harmless beyond a reasonable doubt under the Confrontation Clause analysis. The admission of Hawk's testimony does not present a ground for reversal of the judgment and sentence. .

### III. Prosecutorial Delay.

■ Brown also believes that the State unreasonably delayed his prosecution for Wingler's murder in violation of his due process rights.[5] During this period of delay, he asserts, evidence was lost and witnesses that might have exonerated him died or disappeared. Because a claim of pre-accusatorial delay implicates the Due Process Clause of the United States Constitution, we review de novo. U.S. Const. amends. V, XIV; *State v. Trompeter,* 555 N.W.2d 468, 470 (Iowa 1996).

---

**3.** Kenny Bevard testified:

> Q. Okay. So what's Deny told you? A. Lots of things, we talked everyday all day long.
> Q. What's he told you about this case? A. He's told me almost everything about this case. He's told me that it was a hit and that it wasn't a robbery. He told me that he was the trigger man [sic], he told me he shot Wingler three times, he said there was a 9 millimeter Lama [sic], I believe was used and he said it was Gary's. He said it was one of Gary's family members that connected them to do this. He told me that they waited for him at his apartment or outside of his apartment area in West Des Moines, whatever it was and that they took him by gunpoint, Burrows drove the Cadillac, it was Wingler's and Deny Brown [sat] in the back seat and Gary Thrasher followed them, I think he said in a VW or something and he said he killed him. And he said that it was supposed to look like a robbery and I asked him one time how much money was involved and he said $2,000.00 or $3,000.00 he thinks that he was supposed to have gotten off of Wingler but that wasn't the point of it anyway.

**4.** Jeffrey Nall testified:

> Q. So you're saying that Mr. Brown admitted to you that he shot A.J. [sic] Wingler? A. Right.

> Q. Did he tell you how he did it? A. No. Well, he said—he went "roof, roof," you know, I mean, like he pulled the trigger of a gun.
> Q. Okay. He didn't give you any details—A. No.
> Q. —of how it went down? A. No. He said he wasn't going to give details because of what happened with this Kenny Bevard telling on him.
> Q. So he said he didn't want to talk about that because someone else had—A. Right.
> Q. —told on him—A. Yeah.
> Q. —basically? A. He said he wasn't going to give—you know what I mean? He wasn't going to go into detail about it.

**5.** There is, of course, no statute of limitations on murder in Iowa. Iowa Code § 752.1 (1977). Indeed, "[a] prosecution for murder may be commenced *at any time* after the death of the person killed." *Id.* (emphasis added); *accord* Iowa Code § 802.1 (2001) ("A prosecution for murder in the first or second degree may be commenced at any time after the death of the victim.") Thus, Brown is unable to argue his prosecution is precluded by a statutory limitation even though it was not commenced until twenty-four years after the commission of the crime for which he was accused.

■■■■ Although "[t]here is no constitutional right to be arrested and charged at the precise moment probable cause comes into existence," the government cannot delay "filing charges to intentionally 'gain [a] tactical advantage over the accused'" without implicating the Due Process Clause. *Trompeter*, 555 N.W.2d at 470 (citation omitted). To prevail on a claim that such a delay violated due process, a defendant has the heavy burden of proving both (1) the defendant's defense suffered *actual* prejudice due to a delay in prosecution and (2) the delay causing such prejudice was unreasonable.[6] *See id.* "To establish actual prejudice, a defendant must show loss of evidence or testimony has meaningfully impaired his ability to present a defense." *State v. Edwards*, 571 N.W.2d 497, 501 (Iowa Ct.App.1997). Generalized claims of prejudice, such as "loss of memory, loss of witnesses, or loss of evidence" do not constitute actual prejudice. *Id.*

■■■■ Brown has failed to prove actual prejudice arising from the delay in his prosecution. Instead, he merely offered generalized claims that are insufficient to establish a due process violation. *See id.* Brown presented an expert on robbery and robbery homicide investigations who outlined a number of concerns raised by the delay in Brown's prosecution in his testimony in support of the motion to dismiss made by Brown prior to his stipulation. The expert indicated there were five or six people he thought "would have pertinent information" that could no longer be located or were deceased. In addition, the expert indicated that some physical evidence in the case, including the car seat in which Wingler's body was found and the coat Wingler was wearing the night of his murder, had disappeared over time. In the course of his testimony, however, the expert was unable to state how the missing witnesses or physical evidence "meaningfully impaired [Brown's] ability to present a defense." *Id.* Instead, the expert offered only generalized claims of prejudice arising from the loss of witnesses and evidence. *Id.* The expert *believed* that further discovery of the missing witnesses and physical evidence could have produced information that *might* have served to impeach other evidence in the case against Brown. He even expressed the *possibility* that the missing witnesses or evidence would have exonerated Brown. However, these types of claims and beliefs are insufficient to establish actual prejudice arising from the delay in the prosecution. They are too general to support a finding of actual prejudice. Accordingly, Brown has failed to establish the first requirement in proving his due process claim, and it is unnecessary to consider the second requirement. We find Brown was not deprived of his due process rights by the delay in the prosecution of his case.

## IV. Ineffective Assistance of Counsel.

Brown's final assertion on appeal is that he was provided ineffective assistance of

---

**6.** Our prior considerations of prosecutorial delay issues have applied a test that looked first to whether a challenged delay was unreasonable and then to whether the delay prejudiced the defendant's defense. *See, e.g., State v. Trompeter*, 555 N.W.2d 468, 470 (Iowa 1996). Surrounding these two elements were three additional principles: (1) a defendant has the "heavy" burden of proving both elements, (2) the prejudice to the defendant must be "actual," and (3) establishing the second element could be seen as a prerequisite in the analysis, *i.e.*, if actual prejudice was lacking, the analysis was finished. *See Trompeter*, 555 N.W.2d at 470; *State v. Edwards*, 571 N.W.2d 497, 501 (Iowa Ct.App.1997). We utilize the factual posture of this case to adopt a new statement of the test for prosecutorial delay claims that merges these various principles into a more manageable statement.

counsel in two respects. First, he asserts his trial counsel failed to adequately inform him of the ramifications of waiving his right to a speedy trial, which precluded his full consideration of the issue and caused substantial and material prejudice to his case. Second, Brown believes his trial counsel was ineffective in failing to fully consider the array of witnesses available to testify on his behalf, resulting in the presentation of an inadequate defense.

■■■■■ A claim for ineffective assistance of counsel may be established only where it is shown by a preponderance of the evidence that ineffective assistance was rendered and the ineffective assistance resulted in prejudice to the party. *Ledezma v. State,* 626 N.W.2d 134, 142 (Iowa 2001). A claim of ineffective assistance of counsel may be determined on direct appeal or in a postconviction proceeding. *Berryhill v. State,* 603 N.W.2d 243, 245–46 (Iowa 1999). However, the claim must normally be first raised and, if necessary, preserved on direct appeal. *Id.* To properly raise a claim for ineffective assistance of counsel on direct appeal, a defendant must do two things: (1) actually raise the issue and, in raising the issue, (2) present it in sufficient detail so that the court can fully assess whether the issue can be decided on the available record or should be preserved for further proceedings. *See id.* If the record on appeal is insufficient to support the claim, counsel for defendant must reveal some specific information that could be presented at a subsequent postconviction relief hearing to support the claim.

■■■■ Brown raised his ineffective assistance of counsel issue before this court, but in so doing, failed to adequately detail the grounds on which such a claim was being asserted. In fact, Brown's argument on this issue leaves us with little to go on in considering whether the record is sufficient to decide his claim on direct appeal or if the issues should be preserved for further proceedings.[7] He claimed his trial counsel did not fully inform him of the consequences of waiving his right to a speedy trial. Yet, Brown did not explain what information he was denied. Similarly, he claimed his trial counsel failed to call his ex-wife as a witness. However, he did not further explain the substance of the proposed testimony or how it could have changed the outcome of the trial. For these reasons, we believe Brown failed to properly raise a claim of ineffective assistance of trial counsel.

---

7. Brown presented a very limited argument in asserting his ineffective assistance of counsel claim. His entire claim was:

### ARGUMENT IV

APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL TO A DEGREE THAT RESULTED IN THE APPELLANT BEING DENIED A FAIR TRIAL.

The Appellant was not fully informed by his trial counsel as to the ramifications of waiving his right to a speedy trial. The Appellant's uninformed waiver caused substantial and material prejudice to the Appellant's case. Had the Appellant fully understood the effect of waiving speedy trial, he would have preserved this right.

Additionally, the Appellant's trial counsel did not effectively explore all avenues with respect to possible defense witnesses. This lack of diligence by trial counsel also resulted in the presentation of a poor defense on the Appellant's behalf. Specifically, the Appellant's ex-wife would have been a very effective witness on the Appellant's behalf. The Appellant was assured by trial counsel that his ex-wife would be called as a defense witness.

However, as can be seen from the record, the Appellant's ex-wife was not called as a witness on the Appellant's behalf. This lack of diligence by trial counsel caused substantial prejudice to the Appellant. Therefore, the [A]ppellant's murder conviction should be reversed and remanded for a new trial with the appointment of new trial counsel.

## V. Conclusion.

Finding no error underlying the judgment and sentence of the district court, we affirm.

**AFFIRMED.**

All justices concur, except LAVORATO, C.J., who takes no part.