# IN THE SUPREME COURT OF IOWA

No. 19–1981

Submitted February 23, 2022—Filed March 25, 2022

**STATE OF IOWA,**

    Appellee,

vs.

**ANNETTE DEE CAHILL,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Muscatine County, Patrick A. McElyea, Judge.

The defendant seeks further review of a court of appeals decision affirming her conviction for second-degree murder, contending posttrial DNA testing was required, a twenty-six year delay in prosecution violated her right to due process, witnesses should have been excluded, and the evidence of guilt was insufficient. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Elizabeth A. Araguás (argued) of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

In October 1992, a young man was beaten to death with a baseball bat in his home just outside of West Liberty. His fiancée discovered his body on their bedroom floor and called 911. An extensive investigation ensued. The defendant was considered a suspect. Her potential motive was clear: she had been romantically engaged with the victim and had been spurned by him the night before. But with no eyewitnesses and no physical evidence, law enforcement could reach no conclusion as to the killer's identity. The case went cold.

Over twenty-five years later, a woman happened to meet a cold-case investigator while at work, and she told him about a murder confession she witnessed while having a sleepover at her friend's house as a nine-year-old girl. She recounted sneaking downstairs after bedtime and seeing the defendant with black candles burning, tearfully apologizing to her deceased lover: "I'm so sorry. I never meant to kill you . . . . I love you." A fresh investigation commenced with this new revelation, and the defendant was ultimately charged with murder and convicted.

The defendant seeks a new trial. She argues the prosecution failed to timely disclose that the four human hairs found on the victim's hand had been determined unsuitable for standard DNA testing. She seeks to compel another form of DNA testing. She also asserts that the twenty-six year delay in prosecution violated her right to due process because it was unreasonable and diminished her ability to present a defense. Additionally, she claims that the

main prosecution witnesses, including the woman who came forward to the cold-case investigator, were too "unreliable and incredible" to be allowed to testify. And, she contends the evidence was insufficient to sustain a conviction.

We believe the defendant received a fair trial. The defendant could have sought DNA testing prior to trial but chose not to. Also, the defendant may still pursue specialized DNA testing in a postconviction proceeding pursuant to Iowa Code sections 81.10 and 81.11. On the matter of delayed prosecution, we find no actual prejudice to the defendant's ability to make her case and no bad faith on the part of the prosecution. Finally, the district court did not err in allowing the jury to scrutinize the credibility of witnesses, and there was sufficient evidence for the jury to find the defendant guilty of second-degree murder. For these reasons and those that follow, we affirm the defendant's conviction and sentence and the decision of the court of appeals.

## II. Background Facts and Proceedings.

In October 1992, Cory Wieneke lived with his fiancée, Jody Hotz, in a house on a gravel road just outside of West Liberty. Wieneke worked nights as a bartender; Hotz worked during the day for a bank in Iowa City. On Tuesday, October 13, Jody left for work around 8 a.m. while Wieneke was still asleep in bed. When Jody returned home around 6:30 p.m., things were out of place. Their dog was outside unchained, and the screen door was left open. She expected Wieneke to be at work, but his car was still there. Jody went inside and found the lifeless body of Wieneke still in his underwear, bloodied and battered, lying face-down on the carpeted floor next to their bed. The sheets and comforter were

mostly off the bed, still around his legs. Blood was spattered on the bed, the floor, and the wall.

A forensic pathologist later testified that the cuts and bruising on Wieneke's body indicated he had sustained thirteen separate blunt-force injuries, seemingly inflicted by a bat or a pipe. Four of those wounds were to his head. The fatal blow had split open the back of his skull and left a large H-shaped laceration.

Before his death, Wieneke tended bar at his uncle's business, Wink's Tap in West Liberty. He had a reputation around town. As a witness at trial put it, "[H]e was a fun guy. He was friendly, outgoing, charming, everybody was his friend. I mean, I didn't know anybody that didn't like Corey." Wieneke drove a conspicuous older-model blue Cadillac. In addition, Wieneke had a reputation for relationships with women. At the time of his death, Wieneke had ongoing sexual relationships with at least three women: Hotz; a woman named Wendi Marshall; and the defendant, Annette Cahill. Also, a fourth relationship was rumored.

Cahill had married and divorced at a young age. Sometime after the divorce, Cahill moved with her two children to live with her brother, Denny Hazen, and his wife, Jacque Hazen, in their farmhouse near Atalissa. Through living together in the Hazen home, Cahill and Jacque Hazen became friends.

When Cahill first met Wieneke, he was sixteen years old. Wieneke was significantly younger than Cahill. They "messed around" but did not have sex at that time. Three years later, they started an "off and on" relationship for at least

a year. But things got more serious in 1992. According to Cahill, during the months leading up to Wieneke's death, they had sex several times a week, whenever the opportunity presented itself. Cahill worked in the bar with Wieneke and they would have sex at the bar, in vehicles, in an apartment above the bar, at the Hazen farmhouse, or elsewhere. Drinking and cocaine use were also a part of their relationship.

By October 1992, Cahill and Wieneke had plans to "skip town." According to Cahill, they had made arrangements to go to Branson, Missouri together to look for a bar to purchase. Cahill wasn't interested in owning a bar, but she loved Wieneke and planned to start a new life with him. By this time, Cahill was twenty-nine and Wieneke was twenty-two.

In addition to Wieneke's relationships with Hotz and Cahill, he had also fathered a child with Wendi Marshall. Marshall's child was born in July 1992, when Marshall was twenty years old. Marshall later testified that she loved Wieneke and had hoped for a future with him. Hotz, Cahill, and Marshall all knew of each other and, at the very least, had heard rumors of Wieneke's relationships with the other women.

On Columbus Day, October 12, the day before Wieneke's death, Cahill and Wieneke each worked a shift at Wink's. Cahill opened the bar in the morning and then stayed at the bar while Wieneke worked the evening shift. Cahill planned to get together with Wieneke after the bar closed at 2:00 a.m. on the 13th. While Wieneke closed up the bar, Cahill got into the front passenger seat

of Wieneke's blue Cadillac and waited for him. She was planning to leave for Branson with him the following weekend.

Wieneke, however, didn't arrive at the car alone; instead, Marshall was with him. Wieneke was planning to drop off Cahill and then go with Marshall. Cahill was furious. She later admitted she was "incredibly mad" and described it as a "fish or cut bait" moment.

Not long after the car started moving with the three of them in it, Cahill tried to open the door and acted like she was going to jump out. Wieneke stopped the car, and Cahill had a heated discussion with him outside the vehicle. Eventually, Cahill and Wieneke got back in the Cadillac, and Wieneke drove Marshall to her car. Wieneke told Marshall in Cahill's presence that he would go to Marshall's house after dropping Cahill off.

Wieneke took Cahill to the Hazen farmhouse where Cahill lived. Wieneke remained long enough so the two of them could have what Cahill described as "angry sex," and then left. Wieneke did eventually show up at Marshall's house, possibly around 3 or 4 a.m. He woke her, and they talked for a bit, but he didn't stay long. Sometime after that in the early morning hours, Wieneke went home, got in bed with Hotz, and fell asleep. When Hotz left for work at 8 a.m., her fiancé, Wieneke, was still asleep.

On the morning of October 13, Cahill surprisingly appeared at a roofing jobsite in West Liberty. The roofing jobsite was run by Lester McGowan, another man with whom Cahill had previously had a sexual relationship. McGowan had picked up Cahill around 7 or 7:30 a.m. and brought her to the jobsite. Her arrival

was not expected by Lester Walker, who was one of the regular workers. McGowan introduced Cahill to Walker and told Walker that Cahill would now be helping him. Cahill had never done roof work before, and she didn't know what she was doing. Walker was told to teach Cahill how to tear off a roof. Cahill did a poor job of removing shingles for about an hour to an hour and a half. At that point, Jacque Hazen showed up in her car. Cahill got into that car and departed, never to return to the jobsite.

A local farmer drove past the Hotz/Wieneke house that morning while on his way into West Liberty. He recalled seeing two people and a stopped vehicle outside the house at 9 a.m. or a little later. He didn't recognize the two people. Presumably, the two people would have seen him.

Hazen and Cahill admitted that, after leaving the roofing jobsite, they went by Wieneke and Hotz's house on the gravel road. According to Hazen, Cahill wanted to drop off "a letter she had written or a book or something." Both Hazen and Cahill claim they were at the house for only a few minutes; Cahill says she knocked on the door and nobody answered, so she and Hazen left.

Hazen and Cahill maintain that they went on together to Iowa City, where Hazen had made a doctor's appointment for a knee issue. Iowa City is about thirty minutes from West Liberty by car. Hazen later produced receipts for the doctor's visit and various shopping transactions in Iowa City, including a three-day typewriter rental. The only receipt with a time stamp on it said 1:45 p.m. The knee issue, diagnosed as "pulled muscles," had no effect on Hazen's ability

to perform these errands, although Hazen testified that she needed to have Cahill along to drive.

After spending the middle of the day in Iowa City, Cahill and Hazen claim that they returned to the Hazen farmhouse in the afternoon to be there when their children got home from school. Cahill and Hazen claim that neither of them learned of Wieneke's death until Cahill reported to work that evening at Wink's. Hazen and Cahill decided to go to the police that night and volunteer to tell them their version of events.

Meanwhile, the same farmer who had seen two people standing outside a car beside the Hotz/Wieneke house in the morning of October 13 drove by the house again in the early afternoon. This time he didn't see anyone, but about a half-mile further along he noticed an aluminum baseball bat lying by the side of the gravel road. That bat was later retrieved and found to have blood matching Wieneke's blood type.

Although law enforcement had found the murder weapon, no physical evidence linking a specific individual to the murder was ever discovered. Over the years, law enforcement looked into various theories, including that Wieneke had been killed for a drug or gambling debt. In 1995, a West Liberty man named Bob Morrison killed his wife and then killed himself. Morrison was known to be prone to violent outbursts, and one theory floated at the time was that Morrison had also killed Wieneke. There were rumors that Morrison's wife had also been having an affair with Wieneke in 1992. Cahill had always been a suspect, but

she had been consistently cooperative with law enforcement and had the Iowa City alibi with Hazen. In any event, the Wieneke murder case went cold.

Events took a dramatic turn in December 2017. Jessica Becker was working as a charge nurse in the intensive care unit at the University of Iowa hospitals in Iowa City. While performing her duties as a nurse, Becker happened to encounter Trent Vileta, a special agent for the Iowa Division of Criminal Investigation (DCI), who was at the hospital to interview a victim-witness in an unrelated matter. Agent Vileta was in plainclothes, so Becker was unaware of his status and asked him what he was doing on the floor. This led to a conversation in which Agent Vileta disclosed that he worked on cold cases. Becker decided to tell him about something she had witnessed twenty-five years earlier when she was nine years old.[1]

As a child, Becker was close friends with Kayla, one of Hazen's daughters, and she was a frequent guest at the Hazen farmhouse. Becker would often go over for sleepovers, and she knew Cahill. Becker recalled interacting with Cahill: "She would take us to get movies, scary movies, pizza. She was the fun, the favorite aunt and we spent quite a bit of time with her, too." Becker also knew Wieneke and described him as a "big brother down the street."

During one sleepover at the Hazens' in the fall of 1992, Becker and Kayla decided to sneak downstairs. Becker recalled, "I'm not sure exactly what we were

---

[1]In Becker's words:

[F]or some reason I just felt comfortable with him and that I could share that knowledge and share that burden and at least if for nothing else to get it off my chest to share with somebody that had the potential to do something with it.

up to, but something that we weren't supposed to be doing . . . ." On direct examination at trial, Becker described what happened next:

> A. We heard some noise when we got down to the bottom of the steps, and then at that point we heard Annette in the dining room and saw her from the back side.
>
> Q. Now, I showed the photo on the screen there showing the stairs. Did you step all the way down on the floor or did you stay on the steps?
>
> A. I can't recall if we actually made it all the way down to the floor or if we were on the last step, but close to either of those spots.
>
> Q. And you said that you heard Annette?
>
> A. Yes.
>
> Q. Tell the jury what you heard.
>
> A. Well, we heard Annette crying and sobbing in the dining area. And we heard her make several statements that included, Corey, I never meant to hurt you. Corey, I'm so sorry. I never meant to kill you, Corey. And Corey, I love you.
>
> Q. You said the defendant was sobbing?
>
> A. That's correct.
>
> Q. Was there anything else unusual in that front room?
>
> A. Yes. There was multiple candles. She was also lighting candles. . . . [B]lack candles, to be specific.

The girls went back up the stairs to avoid being caught, and Becker tried to talk with Hazen's daughter about it, but Hazen's daughter "became defensive and had explained that her aunt was in love with Corey and was very upset about his death and she didn't want to talk about it anymore." Later, Becker told her mother, Cynthia Krogh, what she saw and heard. But Krogh was afraid to take her daughter to the police. She testified,

I was scared. Ron Hazen [Cahill's uncle] was the Sheriff at the time and, I mean, he's a relative. Who was going to believe a nine-year old child and who was going to listen to her? Plus the fact that my ex-husband [McGowan] was still friends with the Hazens, this family, and he had threatened me on a separate occasion that if I didn't keep my mouth shut that he would kill me. So I was scared.

The DCI re-interviewed Cahill. The interviews were recorded and later played back at Cahill's trial. Cahill continued to deny any involvement in Wieneke's murder, but some of her statements could have struck a listener as somewhat odd. Cahill said Wieneke didn't deserve to be killed, yet at the same time she added, "Go knock the shit out of somebody if you are that mad, but . . . don't do this." Cahill also made an arguably defensive statement that when her first husband cheated on her, she got a divorce; she didn't kill him. And her account of her actions on October 13, 1992, had some inconsistencies with prior accounts. For example, she initially claimed not to remember stopping at Wieneke's house before she and Hazen went on to Iowa City—until confronted with her prior statements.

On June 07, 2018, the State filed a trial information to the Muscatine County District Court charging Cahill with first-degree murder, a class "A" felony. *See* Iowa Code § 707.2(1)(*a*) (1991).

Before her first trial, on January 11, 2019, Cahill filed a motion to dismiss based on pre-accusatorial delay. More than twenty-six years had passed since the time of the murder, and Cahill claimed this delay violated her right to due process because it was unreasonable and prejudicial to her ability to put on a defense. She said that other suspects and several key witnesses had died or now

had diminished memories. Cahill also pointed out that Becker had passed along some information to West Liberty police in 2001.

The district court denied Cahill's motion to dismiss on February 14. It found that Cahill had not established actual prejudice at that point simply because persons who had given various statements to law enforcement were no longer available. Furthermore, the court found that any delay in prosecution was not unreasonable because it was not designed to gain a "tactical advantage." *See State v. Wagner*, 410 N.W.2d 207, 210 (Iowa 1987).

The next day, Cahill moved to exclude the testimony of Becker and Krogh under Iowa Rule of Evidence 5.104(*a*), which requires the court to "decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." Cahill argued that the testimony of Becker and her mother was inconsistent and self-contradictory. Cahill also claimed that their testimony was tainted due to bias: Krogh used to be married to McGowan, the contractor, and both witnesses knew that McGowan had cheated on Krogh with Cahill.

The court denied Cahill's motion to exclude witnesses on February 28, reasoning that "[t]he issues raised by Cahill's motion are more appropriate to be decided by the jury as a matter of credibility."

Cahill's first trial occurred in March 2019 and resulted in a hung jury. In July 2019, DCI agents re-interviewed a former friend of the Hazen family, Scott Payne. Payne said that maybe a day or two after Wieneke's death, he was at the Hazen farm when Cahill

> [c]ame speeding up the driveway and went around and out back towards the burn barrel . . . . She got out of the car and opened the trunk and took a paper bag with clothes in it and dumped them out and . . . Jacque [Hazen] met her out at the burn barrel with a gas can and they lit the clothing on fire.

Payne described Cahill as "frantic-like" and said the clothes looked bloodstained, a characteristic he recognized because he used to drain the blood out of pigs, and his clothes were often covered in blood. When asked why he didn't tell law enforcement this information in the prior investigation, Payne explained, "I was not in a good place at that point and time in [my] life. I was driving illegally and doing illegal substances and I tried to avoid the police as often as I could."

Thereafter, the State added Scott Payne to its list of minuted witnesses. In response, on September 3, Cahill filed another rule 5.104(*a*) motion seeking to exclude Payne's testimony. She argued that Payne's testimony was inconsistent and self-contradictory, largely because the DCI had interviewed Payne in 1996 and, at that time, Payne said he heard from someone else that Cahill was seen burning "stuff" after Wieneke's death. He also told DCI that someone named Jeff Murdoch confessed to Wieneke's murder. But in 2019, Payne could not remember what he said in 1996 and said he didn't even know a Jeff Murdoch.

On September 6, the court denied Cahill's second rule 5.104(*a*) motion for the same reasons it had denied the first.

Cahill's second trial began on September 9. Becker, Krogh, Payne, Walker, Hotz, Marshall, and the farmer who had observed the bat all testified, along with a number of law enforcement witnesses. Cahill did not testify, but her recorded

DCI interviews from 2018 were admitted into evidence. Hazen was called as a defense witness but was impeached by prior inconsistent statements.

In the middle of trial, the State realized that the DCI had possession of a draft lab report showing an unsuccessful attempt to perform STR (short tandem repeat) DNA testing on four human hairs found in Wieneke's left hand. This late-disclosed document was viewed at the time as helpful to the prosecution because it tended to dispel a defense theory that the State had not investigated the case thoroughly enough. When the State acknowledged that it could not use the document because of its late disclosure, Cahill's defense team accepted that status quo.

On September 19, the jury returned a verdict finding Cahill guilty of second-degree murder, a lesser included offense. *See* Iowa Code § 707.3. Cahill filed a motion for new trial and also a motion to compel mitochondrial DNA testing on the four human hairs that had been retrieved from Wieneke's left hand. On November 22, the district court denied Cahill's motions and sentenced Cahill to fifty years in prison. *See id.* § 707.3(2). Cahill appealed, and we transferred the case to the court of appeals.

The court of appeals affirmed, and we granted Cahill's application for further review.

On appeal, Cahill raises several claims. First, she contends that she is entitled to a new trial because the prosecution failed to disclose until trial the draft DCI lab report relating to the four human hairs found in Wieneke's hand and because her motion to compel mitochondrial DNA testing on those hairs was

denied. Second, she contends the twenty-six year delay in prosecution violated her right to due process. Third, Cahill urges that the district court should have excluded the testimony of Becker, Krogh, and Payne under Iowa Rule of Evidence 5.104(*a*). And fourth, she asserts the evidence was insufficient to support the jury's verdict.

### III. Standard of Review.

Due process claims asserting a *Brady* violation are reviewed de novo. *DeSimone v. State*, 803 N.W.2d 97, 102 (Iowa 2011). Likewise, claims alleging a due process violation caused by prosecutorial delay are reviewed de novo. *State v. Brown*, 656 N.W.2d 355, 362 (Iowa 2003).

We review the denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020).

"Matters of statutory interpretation and application are reviewed for errors at law." *State v. Tong*, 805 N.W.2d 599, 601 (Iowa 2011).

"Our review of the district court's ruling on a preliminary question of admissibility is for the correction of legal error." *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020). But "[w]hen the preliminary question is one of fact, 'we give deference to the district court's factual findings and uphold such findings if they are supported by substantial evidence.' " *Id.* at 202 (quoting *State v. Long*, 628 N.W.2d 440, 447 (Iowa 2001) (en banc)).

We review sufficiency-of-evidence claims for correction of errors at law. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "[W]e are highly deferential to

the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.*

**IV. Analysis.**

**A. Is Cahill Entitled to a New Trial Based on Late Disclosure of the DCI Draft Lab Report?** As part of its crime scene investigation back in 1992, DCI gathered fibers and hairs from Wieneke's left hand. It determined that they included synthetic fibers, cat hair, and four human hairs. During the first two days of trial testimony, defense counsel asked several of the State's witnesses about the four human hairs found in Wieneke's hand, setting up a jury argument that the State had failed to test them to see if they might match someone of interest in the case.[2]

This prompted Agent Vileta during trial to call the DCI lab, which retrieved a draft lab report indicating that "none of the human hairs were suitable for DNA STR analysis." The following morning, the parties made a record outside the presence of the jury concerning the previously undisclosed draft report. The district court asked the parties what they intended to do:

> THE COURT: . . . Have you developed a plan with this document?
>
> MR. OSTERGREN [Prosecutor]: Well, as much as I'd like to introduce the fact that the hairs were not suitable for analysis, I don't really know how I can do that.

---

[2]For example:

> Q. Are you familiar with any followup investigation of those human hairs that were found in the left hand of the victim?
>
> A. I am not.

THE COURT: Okay.

MR. OSTERGREN: The report's not signed, it's not in the Minutes so my plan was to just not use it at this point. So if Counsel wants to use it, I would not object to them offering it as an exhibit, but, you know, the State basically plans to leave it lay.

THE COURT: All right.

With that, what record does the Defense wish to make? Mr. Erdahl or Ms. Araguas?

MS. ARAGUAS [Defense Counsel]: So just to be clear, the State is not intending to offer this as evidence?

MR. OSTERGREN: Right.

MS. ARAGUAS: Okay. I think with that in mind we don't have any fighting issue here.

THE COURT: All right. Then we'll close the record with this issue. If something else comes up, certainly let the Court know and we'll make a further record and address it.

The draft lab report was never admitted into evidence, and the issue did not surface again during the remainder of trial. Five days later, at closing argument, the defense took advantage of the state of the record to argue that there had been human hair found in Wieneke's left hand but no evidence to show it matched Cahill's hair:

> There were four human hairs found in [Wieneke's] left hand. Look at the scene and the facts. Does that seem more likely than a killing by a 120-pound 5-foot seven woman? Or more like something done by a powerful man?
>
> . . . .
>
> Let's revisit the human hair evidence. There were four human hairs in the victim's left hand. State has presented no evidence that the human hairs matched Annette's hair either by microscopic comparison with known hairs through slides or by DNA comparison. Moreover, the hairs tell us it is unlikely Corey was unaware of his assault. The fact he was an experienced fighter, weighed 230 pounds

and was a football player make it unlikely that there was only one assailant unless that was someone powerfully built.

After trial, the defense became aware that another form of DNA testing—mitochondrial DNA (mtDNA) testing—was available in addition to STR DNA testing. MtDNA testing is typically performed when a sample is insufficient to allow STR DNA testing. It is less precise but can definitively exclude an individual from being the source of the DNA.

Cahill thus sought a new trial or at least a delay in the entry of judgment and sentence while a lab performed mtDNA testing at State expense. Cahill urged that she was entitled to a new trial based on the untimely disclosure of the draft lab report and because the draft lab report constituted newly discovered evidence. The district court overruled these motions.[3]

The State concedes that the draft lab report should have been disclosed before trial but denies that it was favorable to the defense or material to the defendant's guilt. *See Uranga*, 950 N.W.2d at 243 (explaining that a new trial based on newly discovered evidence under Iowa Rule of Criminal Procedure 2.24(2)(*b*)(8) requires that the evidence be "material" and "probably would have changed the result of the trial" (quoting *State v. Smith*, 573 N.W.2d 14, 21 (Iowa 1997))); *Moon v. State*, 911 N.W.2d 137, 145 (Iowa 2018) (explaining that a *Brady* violation requires a showing that the evidence was "favorable to the defense" and

---

[3]The State argues that Cahill failed to preserve error on the alleged *Brady* violation by not moving for a new trial on that ground, while conceding that she did move for a new trial based on newly discovered evidence. In this case, the two arguments are essentially two peas from the same pod because the alleged newly discovered evidence was in the State's possession before trial. We will consider both grounds preserved.

"material to the issue of guilt" (second quoting *DeSimone*, 803 N.W.2d at 105)). The district court found it was neither favorable to the defendant nor material. On our de novo review, we agree.

First, it is undisputed that before trial, Cahill's attorneys were well aware that four human hairs had been obtained from Wieneke's left hand. Presumably, the hairs were still available for DNA testing. Yet Cahill's attorneys did *not* seek to have DNA testing performed. Evidently, they preferred to argue that the unidentified human hair created additional uncertainty as to how thorough the State's investigation had been, whether there had been a struggle, and who the true killer was. It is difficult to see how this calculation would have been any different if Cahill's attorneys had known before trial that the prevalent form of DNA testing could not be performed, even if they had known a less specific form of testing possibly could be performed.

Of course, after Cahill was convicted, all bets were off. At that point, Cahill was looking for any path to a new trial. But we should assess *Brady* materiality by examining a counterfactual of how the trial would have played out *with* timely disclosure. *See DeSimone*, 803 N.W.2d at 105 ("[T]he materiality requirement requires the court to assess the possible effects nondisclosure had on trial preparation and strategy, not merely the weight of the evidence."). It is difficult to imagine that with timely disclosure of the draft lab report, this trial "would have taken on a different dynamic." *Id.* at 106. Cahill's counsel already knew the hairs were there and hadn't sought to have them tested.

Second, other evidence tends to show there was no struggle. Wieneke was last seen alive by his fiancée sleeping in his bed in his underwear, and his dead body was found face down on the carpeted floor next to the bed in his underwear with the back of his head bludgeoned. Wieneke's head, back, and shoulders were struck thirteen times by a baseball bat. There was blood on the bed, indicating that he had been initially struck there before his body rolled onto the floor, where he was found with his legs still wrapped in bedding. There were no bruises on his hands or forearms as might have been the case if Wieneke had put up resistance.

Third, we have said that a defendant "is not entitled to a new trial on the basis of newly discovered evidence where the defendant was aware of the evidence prior to the verdict but made no affirmative attempt to obtain the evidence or offer the evidence into the record." *Uranga*, 950 N.W.2d at 243. We seek to "prevent the defendant from gambling on a defense verdict while holding back his grounds for a new trial in case the jury returned a verdict of guilty." *Id.* at 243–44.

In this case, defense counsel found out about the draft lab report several days before the case went to the jury and told the court, "[W]e don't have any fighting issue here." In other words, Cahill was content to let things lie and to argue that an unknown person's hair was found in Cahill's left hand while implying that the State didn't bother to check it out. In fairness, the defense didn't learn until two months after trial that mtDNA testing can potentially be

performed when there isn't enough material for STR DNA analysis.[4] But this gets back to our first point: If it took the defense, even with the incentive of a guilty verdict and a looming fifty-year prison sentence, two months just to arrive at a theory why earlier disclosure of the draft lab report would have been beneficial, what are the odds that anything different would have happened had this report been disclosed before trial?

Lastly, Cahill argues she should have been granted mtDNA testing posttrial and prior to sentencing under the authority of Iowa Code sections 81.10 and 81.11. But these provisions contemplate the filing of a separate postconviction application for DNA testing. The application must cover twelve discrete points. *See* Iowa Code § 81.10(2)(*a*)–(*l*). A proceeding is commenced in the district court where the conviction took place. *See id.* § 81.10(3)(*a*). The application is served with sixty days to respond. *See id.* The court hears the application. *See id.* § 81.10(3)(*b*). Cahill did not undertake these steps, and we find she has failed to preserve error below on any claim for relief under sections 81.10 and 81.11.

---

[4]Cahill also asserted at oral argument before us that the lab report could have been used to impeach prosecution testimony that DNA testing was not available at the time when the crime was investigated. However, the ability to use the report for any impeachment purpose would have been immediately apparent during trial. *See Uranga*, 950 N.W.2d at 243; *see also State v. Clark*, 814 N.W.2d 551, 563 (Iowa 2012) (explaining that "evidence is not considered suppressed in a constitutional sense ' "if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence" ' " (quoting *State v. Piper*, 663 N.W.2d 894, 905 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545 (Iowa 2010))).

The draft lab report is undated, so it is not clear when the effort to subject the hairs to STR DNA testing occurred. The State represented below that it took place in or after 2001.

Our opinion does not foreclose Cahill from filing a separate application under Iowa Code sections 81.10 and 81.11. We offer no view on whether such an application would or would not meet the requirements of the statute.

For the foregoing reasons, we find that Cahill is not entitled to relief on direct appeal based on the State's late disclosure of the draft DCI lab report.

**B. Should Cahill's Motion to Dismiss Have Been Granted Due to Delayed Prosecution and a Due Process Violation?** Cahill contends that the State's case should have been dismissed because the twenty-six-year delay in filing charges was a due process violation. "To prevail on a claim that such a delay violated due process, a defendant has the heavy burden of proving both (1) the defendant's defense suffered actual prejudice due to a delay in prosecution and (2) the delay causing such prejudice was unreasonable." *State v. Smith*, 957 N.W.2d 669, 677 (Iowa 2021) (quoting *Brown*, 656 N.W.2d at 363). "There is no constitutional right to be arrested and charged at the precise moment probable cause comes into existence." *State v. Trompeter*, 555 N.W.2d 468, 470 (Iowa 1996).

The first requirement, actual prejudice, requires defendants to show their "ability to present a defense" has been "meaningfully impaired." *Smith*, 957 N.W.2d at 677 (quoting *State v. Edwards*, 571 N.W.2d 497, 501 (Iowa Ct. App. 1997)). "Generalized claims of prejudice, such as 'loss of memory, loss of witnesses, or loss of evidence' do not constitute actual prejudice." *Brown*, 656 N.W.2d at 363 (quoting *Edwards*, 571 N.W.2d at 501).

Last year, in *State v. Smith*, we found that a thirteen-month pre-indictment delay between the time the defendant was charged with robbery and the time the arrest warrant was served did not violate the Fourteenth Amendment to the United States Constitution or article I, section 10 of the Iowa Constitution. 957 N.W.2d at 673–74, 680. In terms of prejudice, the defendant raised generalized claims of "spoliation" and "faded memories." *Id.* at 678. He also argued that he had missed an opportunity for concurrent sentences because he should have been charged while still serving an unrelated sentence. *Id.* We rejected the defendant's generic assertions of prejudice and found that he could not show that his sentences would have run concurrently or that the State delayed prosecuting him solely to avoid concurrent sentences. *Id.* at 679.

An earlier case, *State v. Brown*, involves facts more like the present case. 656 N.W.2d 355. Murder charges were brought twenty-four years after the crime. *Id.* at 358–59. But twelve years after the murder, an inmate had contacted the police with new information. *Id.* at 358. The inmate gave a full interview in which he described his involvement in a scheme with the defendant to commit robbery. *Id.* at 358–59. He claimed that the defendant deviated from their plan and killed the victim instead. *Id.* at 359. Even though the county attorney's office heard of this development, the investigation did not move forward. *Id.* Twelve years later, a new county attorney reopened the investigation and ultimately prosecuted the defendant. *Id.*

The defendant argued on appeal that a twenty-four-year delay in prosecution violated his due process rights because "evidence was lost and

witnesses that might have exonerated him died or disappeared." *Id.* at 362. Yet he presented an expert who "offered only generalized claims of prejudice" and could not express how the defense was meaningfully impaired. *Id.* at 363. Consequently, we held that the defendant failed to prove actual prejudice. *Id.*

In another cold case, *State v. Hall*, it took the State seven years to file charges. 395 N.W.2d 640, 641 (Iowa 1986). The prosecution explained that its delay was primarily the result of a key witness changing his story. *Id.* at 642. Without that witness's testimony implicating the defendant, the State doubted whether it could get a conviction. *Id.* Also, investigators did not know where to find the defendant for five years after the murder. *Id.* We found the delay to be reasonable. *Id.* at 643.

*State v. Trompeter* presented a different scenario. 555 N.W.2d 468. The defendant was released from a juvenile facility the day before his eighteenth birthday, where he had been held for committing third-degree sexual assault. *Id.* at 469. When he turned eighteen the next day, the prosecutor charged him with second-degree sexual assault for an incident that the State had been aware of for nearly three years. *Id.* The prosecutor's stated reason for the delay was that he understood the defendant to be receiving treatment as a juvenile but learned from professionals that he was likely to reoffend. *Id.* at 469–70. In effect, the prosecutor's plan was to prolong the defendant's incarceration by bringing charges seriatim. *Id.* at 471. We held that this strategic move was not a legitimate reason for delay and was therefore unreasonable. *Id.* We also found that the defendant's facing charges in adult criminal court rather than juvenile court

amounted to actual prejudice. *Id.* We affirmed the district court's dismissal of the second-degree sexual assault charge. *Id.* At the same time, we recognized that "further investigation into the crime" was an "obvious example" of a legitimate reason that might justify a delay in bringing criminal charges. *Id.* at 470.

Turning to the present case, Cahill maintains her defense was hampered because certain individuals who had given law enforcement information about other suspects were no longer available. In particular, according to Cahill's investigator, nine persons who previously had information on six other suspects had either died or suffered from diminished memory by 2019. However, for the most part, these individuals had only offered secondhand hearsay and rumors. And their stories contradicted each other. Cahill does not claim that any specific individual would have saved the day for her; at most she claims that her "ability to present a complete defense was meaningfully impaired by her inability to investigate the statements made by these witnesses" and her "inability to thoroughly investigate and possibly interview these deceased suspects meaningfully impaired her ability to present a complete defense."

Actually, despite the passage of twenty-seven years between Wieneke's death and the trial, we are struck by how much evidence was still available to Cahill. Her alibi witness, Jacque Hazen, testified, but apparently her testimony was not convincing. The layout of the Hazen farmhouse remained intact, and Cahill was able to present photographs and make arguments to the jury as to why Becker could not have seen and heard what she testified she saw and heard.

Furthermore, Hazen's daughter, Kayla, presumably would have been available to testify had Cahill chosen to offer her as a witness. Accordingly, we find that no actual prejudice resulted from the delay.

In addition, the State's delay was not unreasonable. In *Hall*, we decided that a seven-year lag in bringing murder charges was "both reasonable and justified" given that the State "was uncertain of the likelihood of a conviction" until a key material witness changed his story and implicated the defendant. 395 N.W.2d at 642–43.

Here, Becker's firsthand witnessing of Cahill's confession was critical to the State's case. Yet Becker didn't speak to the DCI until December 2017. At that point, a reinvestigation ensued and charges against Cahill were brought within several months. Cahill argues that Becker also spoke to West Liberty police sometime in the early 2000s, but her actual deposition testimony (which was filed in connection with the motion to dismiss) makes clear that this was a limited interaction:

> Q. And you didn't tell anyone between telling your mother in 1992 and telling Agent Vileta in 2017?
>
> A. I -- I thought that I had said something to a West Liberty Officer at some point about the case, but not the exact details.
>
> . . . .
>
> Q. And how did you encounter that officer?
>
> A. I believe I was down there over an issue with a pet of mine and just in conversation, but -- I don't recall what the officer said to me, and it wasn't shared detailed as to what I'd overheard.
>
> Q. So -- I'm sorry. So you just asked him about the case, in general?

A. Um-hum. Yes.

Q. And did you tell him that you knew anything about the case?

A. I -- I said something about Annette, and I believed that the officer dismissed me, and I couldn't even tell you which officer it was.

Q. Do you think this was within the last five years?

A. No. It would have been shortly out of high school.

Q. What year did you graduate from high school?

A. 2001.

Q. So sometime in the early to mid 2000's?

A. Yes.

Q. Did you tell that officer that you'd seen Annette Cahill say that she killed Corey?

A. No.

Cahill has not shown actual prejudice. Neither has she shown that the prosecution acted unreasonably. Therefore, her due process claim was properly rejected.

**C. Should Cahill's Rule 1.504(*a*) Motion to Exclude Becker, Krogh, and Payne as Witnesses Have Been Granted?** Iowa Rule of Evidence 5.104(*a*) states, "[T]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."

Cahill argues that the district court erred in admitting the testimony of Becker, Krogh, and Payne. She characterizes the testimony of these witnesses as "impossible and absurd and self-contradictory." *See Graham v. Chi. & N.W. Ry.*,

119 N.W. 708, 711 (Iowa 1909), *aff'd in part, rev'd in part on reh'g*, 122 N.W. 573 (Iowa 1909). Under her theory, the court should have decided, as a preliminary question under rule 5.104(*a*), that their testimony could not be heard by the jury because it was too "unreliable and incredible."

We have previously held, citing *Graham v. Chicago & N.W. Ry.*, that "the testimony of a witness may be so impossible, absurd, and self-contradictory that the court should deem it a nullity." *State v. Mitchell*, 568 N.W.2d 493, 503 (Iowa 1997). But we have only applied the *Graham* rule when reviewing whether evidence was sufficient to sustain a verdict. *See, e.g.*, *State v. Lopez*, 633 N.W.2d 774, 785 (Iowa 2001) (determining whether inconsistent testimony should have been considered in the context of a sufficiency of the evidence review); *Mitchell*, 568 N.W.2d at 502–04 (discussing the *Graham* rule in the sufficiency-of-the-evidence context); *State v. Frank*, 298 N.W.2d 324, 328–29 (Iowa 1980) (applying the rule when the defendant argued for a directed verdict because "recanted testimony should not be considered and that without it there was not sufficient evidence to submit the case to the jury"); *Graham*, 119 N.W. at 710–12 (finding evidence to be so "self-contradictory that it should be deemed a nullity" while considering whether the "[d]efendant's motion to direct a verdict should have been sustained"); *see also State v. Smith*, 508 N.W.2d 101, 103–05 (Iowa Ct. App. 1993) (holding that self-contradictory statements of alleged victims, as the only evidence of guilt, were insufficient to support a conviction). Cahill does not cite a single reported Iowa case holding that inconsistencies in recollection or narrative are, by themselves, a ground for excluding a witness.

Rule 5.104(*a*) is not a substantive rule of evidence. The relevant substantive rule is Iowa Rule of Evidence 5.601. It states that "[e]very person is competent to be a witness unless a statute or rule provides otherwise." *Id.* As Professor Doré has explained, "The basic premise behind Federal Rule 601 and presumably behind the most recent Iowa rule is that virtually all witnesses who possess relevant evidence should be allowed to present it to the jury and allow the jury to determine its probative value." 7 Laurie Kratky Doré, *Iowa Practice: Evidence* § 5.601:1, at 535 (2018–2019 ed. 2018); *see also State v. Brotherton*, 384 N.W.2d 375, 378 (Iowa 1986) (en banc) (affirming the trial court's determination that a four-year-old was a competent witness and stating that "[c]ompetency of a witness is not disproved by a witness' 'mere testimonial inconsistency;' rather, this is a matter directed to the weight to be afforded the witness' testimony by the jury" (quoting *State v. Paulsen*, 265 N.W.2d 581, 586 (Iowa 1978))).

Cahill's challenges to the three witnesses are classic examples of jury arguments about weight rather than arguments for the court about admissibility. For example, Cahill maintains that Becker's story was not believable because the stairway from which she observed the candlelight confession had a door at the bottom that would have obstructed the view to the dining room. But there was no door at the time of trial. The only evidence for such a door came from one of Cahill's 2018 interviews when she drew a floorplan purporting to show a door. It is noteworthy that Hazen testified for the defense but was not asked about a door. In any event, the door (if there was one) could

have been open. The district court did not err in allowing Becker—and therefore Krogh—to testify.

Cahill's arguments about Payne's competence to testify suffer from the same deficiencies. Cahill argues that Payne didn't disclose that he had witnessed the burning of bloody clothes despite prior opportunities to do so; his 1996 interview indicated only that he had secondhand information about Cahill having been seen "burning a bunch of stuff."[5] Cahill also argues that Payne was biased because he loaned the Hazens $5,000 that they never repaid. Again, these matters go to weight and not admissibility. Payne testified that he was a heavy drinker and drug user in the 1992 to 1996 time period and "was not in a good place." The jury could decide whether this explanation enhanced or diminished his credibility.

It was not the district court's job to decide on witness credibility prior to trial. *See State v. Musser,* 721 N.W.2d 758, 761 (Iowa 2006) ("It is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005))).

**D. Was the Evidence Sufficient to Allow a Jury Determination of Guilt Beyond a Reasonable Doubt?** Cahill contends that the State lacked substantial evidence to prove that she was the one who battered Wieneke to death with an

---

[5]A DCI agent testified at trial that Payne told him in 1996 that the "stuff" was a diary.

aluminum baseball bat. No physical evidence or eyewitness testimony implicates Cahill. And she was physically of much slighter build than Wieneke.

On our review of the record, we find sufficient evidence to sustain the conviction. Becker's testimony as to Cahill's confession was corroborated by Cahill's admitted presence at the Hotz/Wieneke home near the time of the murder and Payne's testimony that he saw Cahill burning bloody clothes.

Some other points are worth noting. The forensic and photographic evidence strongly suggests that Wieneke had been struck fatally in the back of his head while he was asleep or incapacitated. So the physical dimensions of his assailant would not have mattered as much. Also, the State's most important witness, Becker, had an impressive life history as an ICU charge nurse and an officer in the Army Reserve while raising a family. Perhaps of greater significance to the jury, her testimony was relatable. The actions of nine-year-old Becker and the memories that stuck out in her mind were in line with what one would expect from a child that age. Also, Becker did not seem to have a vested interest in the outcome of the trial; she just happened to have met an agent who worked cold cases and told her story. On top of that, Becker's mother confirmed that Becker had been consistent in her story since 1992.

While Payne clearly had some reliability issues, the jury could have believed him as well. Perhaps he had not previously been forthcoming because he was engaged in illegal activity and was friends with the Hazens at the time.

Also damaging to Cahill's case were the interviews she gave to the DCI. In her video interview, even after the passage of over twenty-five years, her raw

emotions in regard to Wieneke come through. Cahill admitted she had been badly hurt by Wieneke's rejection the night before the murder occurred. She characterized the night as "horrible." Cahill also described her obsession with Gothic novels in the video interview, a detail that could have made Becker's testimony about black candles ring true.

In addition, Cahill's and Hazen's account of October 13, 1992, just didn't make sense and could have been seen as an elaborate effort to stage an alibi. For instance, it is curious that Cahill decided the morning after a wrenching and nearly sleepless night to try her hand at removing roof shingles for the first time. She then visibly departed the job site within an hour to an hour and a half when Hazen arrived and never returned. Hazen's medical appointment in Iowa City and the need for Cahill to come along were also strange. One could question the severity (or existence) of Hazen's knee injury since she was mobile enough for a shopping trip, treatment turned out to be unnecessary, and the ailment was diagnosed as "pulled muscles." Hazen also shopped various locales around Iowa City at a time when the family budget was tight enough they couldn't pay the phone bill. It is reasonable to assume jurors who have experienced financial troubles might question this story.

**V. Conclusion.**

For the foregoing reasons, we affirm Cahill's conviction and sentence and the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**